639 A.2d 421

COMMONWEALTH of Pennsylvania, Appellee,

v.

Frederick E. MAYHUE, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 20, 1993.

Decided March 18, 1994.

Robert E. Stewart, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Kemal A. Mericli, Michael W. Streily, Asst. Dist. Attys., Robert A. Graci, Office of the Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY and MONTEMURO, JJ.

### OPINION

MONTEMURO, Justice.

This is a direct appeal[1] from a judgment of sentence of death, entered in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division. Our standard of review in such cases is set forth in the sentencing code, 42 Pa.C.S.A. § 9711(h) which provides:

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for further proceedings ...

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

---

1. 42 Pa.C.S.A. § 9711(h)(1) provides:

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

After reviewing the evidence in the present case as well as the ten issues raised by appellant, we sustain his conviction of murder of the first degree, but vacate his sentence of death and remand for imposition of a sentence of life imprisonment on the grounds that the evidence fails to support the finding of at least one aggravating circumstance.

Appellant, Frederick E. Mayhue, was convicted by a jury of murder in the first degree on January 6, 1988. Following this verdict, a sentencing hearing was held on January 7, 1988, pursuant to 42 Pa.C.S.A. § 9711. At the close of the hearing, the jury unanimously imposed a sentence of death. In reaching this decision, the jury found the aggravating circumstance of "contract to kill for pay" outweighed any mitigating circumstances. The trial court then filed an order sentencing appellant to death on January 8, 1988.

Appellant subsequently filed a Motion for a New Trial/Arrest of Judgment on January 19, 1988. Appellant refiled this motion on May 25, 1988. On October 31, 1988, the trial court issued an order denying the motion. This automatic appeal then followed.

## I.

### Sufficiency of the Evidence

The facts from which this case arises are as follows: The victim, Harlene Mayhue, was last seen alive on the evening of December 15, 1986, when she left her daughter's birthday party at 10:45 p.m. Her mutilated body was subsequently found by David Kisow and Donald Meerdo at approximately 3:00 a.m. on the morning of December 16, 1986, in the trunk of the car she had been driving when last seen.

An autopsy performed on Mrs. Mayhue's body on the morning of December 16th revealed five deep lacerations in the victim's skull and marked hemorrhage in her brain. The victim's skull was broken. Dr. Leon Rozin, who performed the autopsy, testified that these injuries were consistent with blows from a baseball bat or similar object. (Trial Transcript (T.T.) 12/10–15/87 at 238). Dr. Rozin also noted that the victim's neck bone was fractured. (T.T. at 242). In addition, the autopsy revealed that Mrs. Mayhue had been shot between the eyes and in the left temple. Two .25 automatic caliber bullets were found in the victim's head. According to Dr. Rozin, the minimal hemorrhaging along the tracks of these bullets indicated that the victim had still been alive at the time she was shot. (T.T. 12/10–15/87 at 241). Dr. Rozin determined the cause of death to be trauma to the head. Based upon his examination of the body, he was of the opinion that the victim had first been beaten, then strangled, and finally shot. (T.T. 12/10–15/87 at 246).

The chain of events that culminated in this brutal murder began in August of 1981, when the victim filed for divorce from appellant. Due to extensive litigation regarding tax liabilities and business holdings, however, the divorce had still not been finalized at the time of the victim's death. These bitter and protracted proceedings resulted in appellant's harboring an extreme animosity toward Mrs. Mayhue and her boyfriend, Barry Carle, appellant's former financial advisor, with whom Mrs. Mayhue became romantically involved in December, 1981.

At the time of her murder, Mrs. Mayhue was residing at what had been the family residence, an 18 acre horse farm on Sunflower Road (Route 68) in Daugherty Township, Beaver County. Barry Carle frequently stayed there as well. In addition, due to past abuse, Mrs. Mayhue had secured a court order prohibiting appellant from entering the property. Appellant, meanwhile, was living in a condominium in another part of Beaver County.

As previously noted, Mrs. Mayhue attended a birthday party for her daughter, Debbie Meyer, on the evening of

December 15, 1986, and departed at 10:45 p.m. from her daughter's house where the party was being held. She was driving a 1984 Oldsmobile belonging to Barry Carle. Appellant had called Debbie at about 9:00 p.m., and had been informed by Debbie that her mother was at the party. Appellant stated that he was at his parents' house processing a deer, and would be unable to attend.

At approximately 1:30 a.m. on the morning of December 16th, Barry Carle telephoned the Meyer residence seeking Mrs. Mayhue, who was not at home when he arrived there at 12:45 a.m. Knowing that the trip from Debbie's home in New Galilee, Pa. to Mrs. Mayhue's home on Sunflower Road typically took twenty-five to thirty minutes, Debbie's husband, Jeff Meyer, and Mr. Carle decided to drive along the route usually taken by Mrs. Mayhue in case her car had broken down or she had been in an accident. After this search proved to be of no avail they called the state police.

At approximately 2:45 a.m., David Kisow arrived at his home in Allegheny County accompanied by Donald Meerdo. The two men had been Christmas shopping earlier in the evening and had subsequently stopped at a local bar. Upon their arrival at Kisow's house, they noticed a strange car, later identified as Barry Carle's Oldsmobile, backed against Kisow's garage door with the keys in the ignition. After removing the keys, Kisow and Meerdo opened the trunk and found the body of Harlene Mayhue.

Upon making this discovery, Meerdo wanted to call the police. Kisow, however, urged him not to stating that, "if he didn't get rid of the car he'd be dead". Despite Kisow's requests, Meerdo called the police. This call was logged in by the Findlay Township Police at 2:59 a.m.

Detectives of the homicide unit of the Allegheny County Police along with local police and members of the coroner's office were immediately dispatched to the scene. Upon their arrival, the detectives examined the trunk of the car. There they observed the body of a white female, her severely beaten face pointing toward the trunk opening. The victim's head

was partially wrapped in a white scarf, which appeared to have a bullet hole in it, but due to the victim's extensive facial injuries, the detectives were unable to determine if she had been shot. Two spent .25 automatic caliber shellcasings were later found beside the vehicle. A bloody baseball bat was lying between the victim's legs. After the victim's driver's license was found, the police were able to make an initial identification of the victim as Harlene Mayhue.

When interviewed by the police, David Kisow initially denied having any knowledge concerning the murder. It was not until a phone conversation with appellant on December 21, 1986 left him fearing for his life that Kisow contacted police and began to cooperate with their investigation.[2]

At trial, Kisow testified that he had known appellant, who had been a close friend of his deceased father, since 1978. Since 1981, Kisow had been traveling to Colorado to perform construction work, returning to Pennsylvania each year from December through April. According to Kisow, upon his return in 1981 appellant had approached him and asked if Kisow would chop up a car for him. Kisow stated that he would. This favor was to be payment for the proceeds of a cocaine sale made by Kisow for appellant in 1980/81, which had been stolen from Kisow's house before the money could be given to appellant.[3] Kisow testified that upon his return to Pennsylvania in 1982, appellant's request changed to whether Kisow would mind chopping up a car if it had a body in it. (T.T. at 89). Appellant then repeated this request each time Kisow returned home from 1982–1986. Upon Kisow's return in September, appellant paid him a visit and asked him if he had

**2.** After the murder, Kisow had gone to the funeral home to pay his respects to the Mayhue family. While there he encountered appellant. At the time he apologized to appellant for what had happened, but told him that he had to do it. Appellant did not say anything to him at that time. A few days later Kisow received a phone call from appellant. Kisow could tell from the sound of appellant's voice that he was angry. Appellant said he wanted to talk to Kisow. It was at this point that Kisow panicked and went to the police.

**3.** Kisow testified that prior to this request he had previously declined appellant's requests that he "rough up" Barry Carle or provide appellant with some dynamite to blow somebody up (T.T. at 85).

thought about their deal. (T.T. at 92–93). Kisow, however, was in a hurry and did not answer. Kisow stated that he next heard from appellant a few weeks later when appellant called and told him not to be surprised if he found a car in his driveway. (T.T. at 95). As previously indicated, Kisow subsequently found a car in his driveway on the morning of December 16th when he and Donald Meerdo made their gruesome discovery.

After finding Mrs. Mayhue's body, the police proceeded to her residence on Sunflower Road. There they discovered patches of blood in the driveway near the entrance to the garage. The blood had been covered with gravel and leaves in an apparent attempt to conceal it. In addition, the officer's found two buttons from the victim's coat and one of her gold earrings near one of the house's window wells. Although police originally believed Mrs. Mayhue had been killed at her home in Beaver County, the discovery of the two spent cartridges at the Kisow residence coupled with the coroner's determination that the victim was still alive at the time she was shot, caused them to conclude that the death had actually occurred at the Kisow residence in Allegheny County after Mrs. Mayhue had been beaten and abducted at her home.

Appellant was interviewed by the police on the morning of December 16th. Appellant told the police that on the previous evening he had been at his father's house processing a deer until 9:30 p.m., and had then returned to his home, where he spent the evening alone. (T.T. at 161,735).

Early in the afternoon of the 16th, Chief Charles Zarillo of the Rochester Township Police Department learned of Mrs. Mayhue's murder, and traveled to the home of James Hardin. Hardin was the elected police/public safety commissioner for Rochester Township. He was also a very good friend of appellant's. When Zarillo arrived at Hardin's home, he observed Hardin speaking with an individual named Steve Gavura. Hardin concluded his conversation with Gavura and approached Zarillo, stating that he had just learned of the murder from Gavura. Hardin also said that he would probably become involved in the investigation since he had been

with appellant the previous evening. According to Hardin, appellant had called him on the evening of the 15th to ask for a ride home. Hardin said he had picked appellant up, taken him home, and stayed with him until 12:30 a.m. While at appellant's residence, they had watched Monday Night Football and drunk a few beers. Zarillo relayed this information to the investigating officers. A few days later Hardin told Zarillo that Mrs. Mayhue had died at 2:00 a.m. Information regarding the victim's time of death, however, had yet to be released. Zarillo again relayed this information to the investigating officers.

After speaking to Zarillo, Troopers Schneeman and Veil of the Pennsylvania State Police arranged to interview Hardin on the evening of December 16th. Hardin told the troopers that on the evening of the 15th, after babysitting until 10:00 p.m., he had driven appellant home, had watched television with him, and had returned to his own home at 1:00 a.m. At trial, Trooper Schneeman testified that Hardin was nervous throughout the interview. Although the troopers knew Hardin's statement was inconsistent with that of appellant, they did not confront Hardin with this inconsistency.

Investigators subsequently learned from Officer Terry Johnke of the Rochester Township Police that after concluding an investigation with the Game Commission on the evening of the 15th, Johnke returned to Rochester Township Police Station between 8:30 p.m. and 8:45 p.m. Johnke testified at trial that when he arrived at the station, Hardin was there, and announced to Johnke that he was expecting a visitor; when the man arrived, Hardin wanted Johnke to leave. Approximately twenty-five minutes later, appellant walked into the station. Johnke stated he knew appellant from a prior occasion and said hello. Johnke left the station about five minutes later, per Hardin's request. When he returned to the station after 11:00 p.m., no one was there.

Johnke also testified that he next saw Hardin two days later on December 17th. At that meeting, which also occurred at the police station, Hardin told Johnke that he had been at appellant's house on December 15th watching football, and

that appellant was using him as an alibi. Hardin asked Johnke if he remembered Hardin's telling him on the 15th that he and appellant were going to watch football. In addition, Hardin asked Johnke to verify that he (Hardin) had been in the station at 10:30 p.m. on the evening of the 15th. Hardin again stated that a man was coming to the station and requested that Johnke leave. Johnke testified that he left the station when appellant arrived shortly thereafter.

Appellant was arrested on December 22, 1986, and charged with the murder of his wife.

At the time of the victim's death, Wayne Shackleford was incarcerated in the Beaver County Jail. After seeing a television news report concerning the murder, Shackleford told a fellow inmate, Alphonso Pittrel, that he knew appellant and had had some dealings with him concerning his wife. Pittrel relayed this information to the warden who in turn contacted the police. The police then arranged to interview Shackleford.

After a series of denials, Shackleford admitted to police that appellant had solicited him to kill Harlene Mayhue, but that his attempts had been unsuccessful. At trial, Shackleford described appellant's efforts to have his wife killed.

Shackleford testified that he first met appellant in the Beaver County Jail when appellant was incarcerated on contempt charges in 1985. After both men were released, they chanced to meet on the street. During the course of their conversation, appellant offered Shackleford $10,000 dollars and a pound of high grade cocaine to kill his wife. (T.T. at 560–61). The two men also discussed three possible plans for carrying out the murder. One plan included bludgeoning Mrs. Mayhue to death with a baseball bat. Another involved shooting the victim in the head, while a third involved arranging the murder to look as if it had occurred during the course of a robbery. (T.T. at 562). In addition, appellant assured Shackleford that he knew judges and lawyers who could help him if anything went wrong. The two men exchanged phone numbers.

Appellant and Shackleford began meeting on a regular basis. According to Shackleford, however, he did not plan on killing appellant's wife but wanted to see what he could get out of appellant. Specifically, Shackleford thought that if he appeared to go along with the scheme, appellant would give him a job. Shackleford was able to obtain an initial payment of $500 from appellant after Shackleford told him that he needed certain equipment before he could go to the victim's residence. Appellant later gave Shackleford another $700 to buy a gun and a ten speed bike,[4] and a half-gram of the "high grade" cocaine appellant had previously offered Shackleford so that Shackleford could test its quality. Following these payments, appellant gave Shackleford a .22 caliber pistol, which they had practiced shooting at a local gun range. This gun was to be used by Shackleford to kill Mrs. Mayhue. Shackleford, however, gave the gun to a friend, Sylvestor Waters. Waters then attempted to sell the gun, but was arrested for possessing a firearm as an ex-convict. The gun was then confiscated.

Once the two men began to meet regularly, appellant took Shackleford to the victim's residence four or five times. On one of these occasions, the two were accompanied by James Hardin. According to Shackleford, appellant and Hardin picked him up and drove to a country road near the victim's residence. Appellant, who was dressed in camouflage clothing, then led Shackleford through the woods to Mrs. Mayhue's home. Once there, appellant identified the various buildings on the property for Shackleford, and described the intended victim. The two fled when a truck arrived at the property. Appellant then contacted Hardin on a walkie talkie to come and pick them up. On the ride back to Shackleford's home, appellant and Hardin decided that Shackleford could find his way through the woods, and that the back road would be the drop off point when the time came to kill Mrs. Mayhue.

On three occasions after this incident, appellant called Shackleford and told him that Hardin would drive him to the

4. This bike was to be used to facilitate Shackleford's escape after he shot the victim.

road behind the victim's residence so he could kill Mrs. Mayhue. After each call Hardin picked Shackleford up. On each of these occasions, however, Shackleford failed to commit the murder. On the first occasion, Shackleford merely wandered in the woods after Hardin dropped him off at the appointed spot. He later told appellant that he had been unable to find his way to the victim's residence. Following this botched attempt, appellant placed reflector tags on the trees to insure Shackleford could find his way. Hardin then drove Shackleford to the appointed spot once again. This time Shackleford followed the reflectors to the Mayhue property. Once there, however, he merely sat and watched the horses and again returned home without committing the murder. On the third occasion, Shackleford told Hardin that he didn't feel like killing the victim that evening, and asked Hardin to tell appellant that they had gone to the victim's property but were unable to commit the deed. Hardin agreed and the two went to dinner at the Red Bull Inn.

Following these unsuccessful attempts, appellant apparently changed his plan as to how the murder should be carried out. Appellant told Shackleford that he could kill Mrs. Mayhue, put her body in her car, and drive it to Kisow's residence, where the car would be chopped up and the body disposed of.

Having by now realized that appellant could not be persuaded to forgo any plans to kill his wife, Shackleford took it upon himself to warn Mrs. Mayhue of appellant's plot to have her killed. On June 10, 1986, he called Mrs. Mayhue from a residence in Ambridge, and, without identifying himself, told her that her life was in danger and that she should be careful. From then on, appellant refused to have anything to do with Shackleford.

Immediately after the discovery of Mrs. Mayhue's body, investigators focused their attention on one Edward Lau. These efforts soon uncovered yet another attempt by appellant to solicit someone to kill his wife.

On April 17, 1985, Lau and another man, Danny Farrel, had been discovered parked outside of Mrs. Mayhue's residence.

That evening Lau had knocked on Mrs. Mayhue's door, telling her that his car had broken down and that he needed water. Mrs. Mayhue refused to open her door and told Lau to go down the road to a gas station. She then called the police. When the police arrived they discovered the two men slouched down in Farrel's car in a parking lot on Mrs. Mayhue's property. A search of the vehicle revealed a ski mask, lighter fluid, and a loaded .25 caliber automatic pistol.[5] At the time of his arrest, Lau told police that the gun was his, that he purchased it at Corney Manns' Bar in McKees Rocks, and that he and Farrel had gotten lost when their car broke down. Lau plead guilty to the firearms violation and received five years probation.

Shortly after the victim's murder, detectives went to Lau's residence to question him about the murder as well as the incident in April, 1985. At that time, Lau told detectives that he had gone to Mrs. Mayhue's house in April, 1985 in order to rob it. The detectives then contacted Lau's attorney and arranged to have a meeting with him and Lau. After the meeting, Lau decided to cooperate with the police in their investigation.

At trial, Lau testified that in January 1985 he had been solicited by a man named Gerry McCarthy to kill appellant's wife. While working as a busboy at the Sheraton Hotel in Station Square, Lau had met McCarthy, who tended bar at the same hotel. McCarthy often sold cocaine to Lau and the two men sometimes partied together.

In January, 1985, McCarthy asked Lau if he wanted to make money by doing a job for him. When Lau indicated his agreement, McCarthy drove him to Beaver County and pointed out the victim's house as the location where the job was to be done. McCarthy then drove to a nearby bar, introduced Lau to a young man at the bar, and told Lau that the man would help him get out of Beaver County if he ever needed

5. The gun was traced to a Walter Gimbus of Ohio. Mr. Gimbus had sold the gun to a Jerry McCarthy sometime between September 1981 and May 1982. McCarthy then gave the gun to Lau. Lau was arrested for possession of the gun as well as loitering and prowling.

any help. McCarthy then drove past the home of Ronald Neish, a friend of McCarthy and Hardin, and told Lau that he could also go there for assistance. On the drive back to Pittsburgh, McCarthy told Lau that the job was to kill the lady who lived in the house he had been shown. McCarthy said that the lady's husband wanted her dead because of their divorce, and was willing to pay $10,000. (T.T. at 876). McCarthy gave Lau a loaded .25 caliber pistol and told him to make sure the hit did not look professional. McCarthy suggested that Lau make it look like a robbery, and either hit the victim with a baseball bat, stab her, or strangle her. McCarthy explained that if Lau hit her in the head with a baseball bat it would be just like hitting a watermelon. McCarthy also assured Lau that if he were caught, everything would be taken care of because they knew people in Beaver County. McCarthy, however, warned Lau not to grab the wrong person because someone else had done that. He also told Lau that he wouldn't want to know what would happen to him if he said anything to anybody. (T.T. at 889).

About a week later, McCarthy asked Lau when he was going to kill the woman. Lau told him that he needed a ride out to the property. McCarthy then arranged to use his girlfriend's vehicle, and he, his girlfriend, and Lau traveled to Mrs. Mayhue's residence. McCarthy dropped Lau off on a road behind the residence and Lau followed a creek to the victim's house. Lau, however, merely sat behind Mrs. Mayhue's garage, and told McCarthy that no one was home. The three then returned to Pittsburgh.

After this incident, McCarthy told Lau that he could no longer drive Lau to the property, since he wanted to have an alibi whenever the murder occurred. McCarthy asked Lau to let him know when the murder would be committed so McCarthy could arrange to be where people were going to see him. McCarthy then gave Lau keys to one of the buildings on the property as well as a floor plan of the victim's house.

Lau next arranged to have his friend, Danny Farrel, drive him to the victim's house. Lau had told Farrel that they were going to the house to pick up stolen goods. When they

arrived, Lau walked up to the residence, but returned to the car with the information that no one was home. They then left the area.

On April 17, 1985, Lau and Farrel returned to Mrs. Mayhue's residence. As previously noted, the two were discovered by the police and arrested.

In February, 1987, the police were contacted by Steve Gavura, the owner of a landscaping and excavation business who owned property adjacent to Mrs. Mayhue's residence on Sunflower Road. He was also a friend of appellant and Hardin.

Gavura told investigators that on the afternoon of April 5, 1985, Hardin and appellant drove to the job site where Gavura was working, and asked if they could borrow his pick-up truck. Gavura said they could. Later that evening, Hardin returned the truck to Gavura's property where Gavura was training one of his employees, Hudson Gibson, to operate a large excavator. Hardin asked Gavura if he would be willing to bury a dog for him. Gavura said that he would, and ordered Gibson to begin digging the hole.[6] While Gibson was excavating, Hardin told Gavura that he wanted to talk to him privately. The two then went to Gavura's mobile home, where Hardin told Gavura that the "four legged dog" was really a "two legged dog." (T.T. at 25). Hardin explained that he wanted to bury the body of a man whom appellant had hired to kill his wife. Appellant had given the man money, but the man had failed to do the job. Hardin said that he, appellant, and "[G]erry the hit man" had shot the guy in the back of the head with a .25 caliber pistol. (T.T. at 1052). Hardin told Gavura that they had wanted to bury the body on the property of Howard Stuber, a business associate of appellant, but had been unable to gain access to Stuber's backhoe. Gravura was assured that if he agreed to bury the body then, Hardin and appellant would come back at a later date and move it somewhere else. Gavura agreed.

6. Gibson corroborated this testimony at trial. (T.T. at 961–968).

Although Hardin did identify the dead man, Gavura later learned that the body was that of one Earl Span.[7]

One to two months after this incident, appellant, Gavura, and Hardin were again at Gavura's property. On this occasion appellant pointed towards the spot where Hardin and Gavura had buried Span, and said to Gavura, "Thanks for taking care of that down there." (T.T. at 1066). Gavura testified that appellant appeared to know where the body was even though he had not been present at the time of the burial, and Gavura had never told him the location of the grave. Appellant went on to tell Gavura, who was also going through a difficult divorce, that, "I'm going to take care of my wife first, and yours, we will take care of her later." (T.T. at 1066). Appellant and Hardin also informed Gavura that "[G]erry the hit man" was a "real professional," a "good hit man," and that he could do the job for Gavura. According to appellant and Hardin, "[G]erry the hit man" worked as a bartender at Station Square in Pittsburgh and dealt drugs. (T.T. at 1067).

On December 15, 1986, as Gavura returned to his house at about 11:15 p.m., he noticed Hardin's vehicle parked on his property, facing towards the victim's residence. He pulled up, and saw Hardin inside his car with a police scanner and a handheld radio. Gavura could hear a male voice speaking to Hardin, but was unable to identify it. Hardin immediately told Gavura to move his car because he was blocking the view. Hardin then pointed towards the victim's residence, and told him that appellant was down there and "its going down." Later, while Gavura was taking a shower, Hardin knocked on the door and asked for some water. Hardin explained that

7. Hardin had brought Earl Span to Gavura's property on one occasion, and had introduced him to Gavura. Gavura had also overheard Hardin arguing with Span on the telephone on a prior occasion. After the argument Hardin told Gavura that Span had "loose lips". Following the burial, Hardin began to refer to Span as a "dog" any time he mentioned his name. On a number of occasions after the burial, Hardin, in the presence of Gavura, would call up Span's telephone number, leave a message on the answering machine, and then laugh. When the papers reported Span missing, Hardin told Gavura that Span had been hired by appellant to kill his wife but didn't do the job even though he took the money. (T.T. at 1072–1076).

appellant had knocked his wife's eyes out and made a mess. (T.T. at 1090). When Hardin later returned the water container he told Gavura that "it" had been just like "Jimmy Hoffa," and that Gavura's wife would be next. (T.T. at 1092).

The following day, Gavura heard that the police had found Mrs. Mayhue's body in the trunk of a car. When he drove to Hardin's residence in the afternoon to drop off some insurance papers, he found Hardin cleaning out the trunk of his car. Hardin asked Gavura to help him gather up ammunition which was lying loose in his trunk, and to help find a glove that Hardin had lost. Gavura looked into the trunk and saw loose .25 caliber ammunition as well as camouflage clothing. He refused to help Hardin, saying that he didn't want to put his fingerprints on anything. Gavura then brought up the subject of Harlene Mayhue's death. Hardin got excited at that point and said, "I told those guys how to do it, they didn't listen to me". The conversation ended with the arrival of Chief Zarillo.

Later that day, Gavura confided to Howard Stuber that Hardin had been in his driveway the previous evening. Stuber advised him to go to the police or get an attorney. Gavura then went to attorney Eugene Martucci, and told him about the incident. When Gavura came to pay his respects at the funeral home, he was confronted by appellant who told him that attorney Martucci had told him what Gavura had said. Appellant warned Gavura not to "say a f___ing thing about Jimmy (Hardin) being in [his] driveway that night." (T.T. at 1101–1120).

After this conversation at the funeral home, Hardin began calling Gavura, asking him to tell police that the only reason he had been at Gavura's house on the night of the 15th was to bring Gavura a bottle of Scotch. Hardin also asked Gavura not to take the police to where they had buried Earl Span; but rather, to take them to a spot where Gavura had actually buried a dead dog. Gavura, however, told Hardin to leave him alone, and informed him that he was going to tell the police what he knew about appellant and Hardin. Hardin was subsequently arrested in February, 1987. Gavura also showed police where the body had been buried on his property. On

February 12, 1987, police disinterred the corpse and identified it as the body of Earl Span.

Later, in September of that year, investigators learned from an inmate at the Allegheny County jail named Wilbert Alexander that appellant's arrest had not ended his efforts to thwart justice. At trial, Alexander testified that during June of 1987, he had been incarcerated following his arrest by Agent Pat McCarthy of the Attorney General's Office on drug charges unrelated to the present matter. At the time of his arrest, Alexander had agreed to aid the Attorney General's Office in ongoing drug investigations. On September 10, 1987, Alexander related to Agent McCarthy that appellant had repeatedly approached him about killing certain witnesses against him, and that appellant had arranged for Alexander to meet with him on September 11th. (Suppression Hearing Transcript (S.H.T.) at 90).

McCarthy then relayed this information to investigators who arranged for Alexander to wear a body wire. It was agreed that Alexander would tell appellant that he was getting out of prison, but that he would otherwise let appellant do the talking. In addition, Alexander was specifically instructed to avoid any conversation relating to the murder case pending against appellant. On the 11th, Alexander met with appellant and told him he would soon be released from prison. Appellant then gave Alexander certain information about the witnesses he wanted killed.

The witnesses, however, were not murdered and appellant and Hardin were subsequently tried and convicted for the death of Harlene Mayhue.[8]

Appellant does not challenge the sufficiency of the evidence to sustain his conviction for murder of the first degree. Nonetheless we are required to conduct an independent review of the record to determine if the evidence is sufficient to sustain a conviction for murder of the first degree. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d

8. Hardin received a sentence of life imprisonment following his conviction.

937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Having done so, we find the evidence in the present case overwhelmingly supports appellant's conviction. Appellant's repeated attempts to solicit someone to kill his wife, coupled with Hardin's statements to Gavura on the night of the murder, and appellant and Hardin's attempts to conceal their whereabouts on December 15, 1986, clearly establish beyond a reasonable doubt that appellant murdered Harlene Mayhue.

## II.

### Appellant's Evidentiary Claims

■ Appellant initially raises five claims of error regarding the admission of evidence at trial. In reviewing the trial court's rulings, we are guided by the rule of law that the admissibility of evidence is a matter addressed to the sound discretion of the trial court, which may only be reversed upon a showing that the court abused its discretion. *Commonwealth v. Claypool,* 508 Pa. 198, 203–204, 495 A.2d 176, 178 (1985). After reviewing appellant's claims in light of this standard, we find them to be meritless.

■ We begin our review of appellant's evidentiary claims by addressing appellant's three contentions regarding the admission of out of court statements under the co-conspirator's exception to the hearsay rule.[9] Under this exception, the out of court declarations of a co-conspirator may be introduced against another co-conspirator provided three requirements are satisfied. The prosecution must prove the existence of a conspiracy between the declarant and the defendant against whom the evidence is being offered. Once this requirement is satisfied the Commonwealth must show that the statements were made during the course of the conspiracy, and finally that the statements were made in furtherance of the common

9. These claims were raised in issues one, three, and four of appellant's brief. However, for the sake of convenience we will address them seriatim.

design. *Commonwealth v. Zdrale,* 530 Pa. 313, 317, 608 A.2d 1037, 1039 (1992).

In his first allegation appellant contends that the trial court erred in admitting the statements of James Hardin pertaining to the death of Earl Span, since these statements do not fall within the "co-conspirator's exception." Specifically, appellant argues that Hardin's statements regarding the death of Earl Span were not made in furtherance of the conspiracy to kill Harlene Mayhue, and cannot, therefore, be admitted under this exception. We disagree. The conversation with Steve Gavura allowed Hardin and appellant to obtain a burial site for the body of Earl Span, thus enabling them to avoid prosecution for that murder, and remain at large, free to continue their ongoing plot against Mrs. Mayhue. Such statements were clearly made in furtherance of the conspiracy to kill Harlene Mayhue, and were properly admitted.

Appellant next alleges the trial court erred in admitting the statements of Gerald McCarthy as statements made by a co-conspirator. In challenging McCarthy's statements, appellant asserts the statements were inadmissible due to the Commonwealth's failure to present sufficient evidence of the underlying conspiracy between appellant and McCarthy. This argument is meritless.

With respect to the introduction of evidence under the co-conspirator exception, the Commonwealth is only required to prove the existence of a conspiracy by a fair preponderance of the evidence. *Commonwealth v. Pinkins,* 514 Pa. 418, 424, 525 A.2d 1189, 1191 (1987). In addition, the Commonwealth need not establish such a preponderance through direct evidence. Rather, a conspiracy, for purposes of the co-conspirator exception, may be inferentially established by showing the relation, conduct or circumstances of the parties. *Commonwealth v. Dreibelbis,* 493 Pa. 466, 475, 426 A.2d 1111, 1115 (1981); *Commonwealth v. Roux,* 465 Pa. 482, 350 A.2d 867 (1976).

The evidence presented at trial clearly established McCarthy's role in the conspiracy to kill Harlene Mayhue. McCar-

thy had supplied Edward Lau with the gun found in Lau's possession when he was arrested outside the victim's house on April 17, 1985. Lau testified that he had planned to use the gun to kill the victim. On two occasions prior to this incident, McCarthy had driven Lau to the victim's residence. On the first occasion, he had pointed out the house as the place to do a job. On the second occasion, McCarthy dropped Lau off on a road behind the victim's house, and Lau followed a creek through the woods to the residence. This was exactly the same modus operandi which appellant and Hardin had planned for Wayne Shackleford to carry out the killing. In addition, McCarthy had provided Lau with a floor plan of the victim's house, and a key to one of the buildings on the victim's property. McCarthy's involvement with appellant and Hardin was further evidenced by Hardin's statement to Steve Gavura that he, appellant, and Gerry the "hit man" had killed Earl Span. Finally, after the burial of Span, appellant had discussed McCarthy's ability as a hit man, and told Gavura that "[G]erry the hit man" worked at Station Square as a bartender, sold drugs, and was a ladies' man. Such intimate knowledge of McCarthy's personal life and his ability as a contract killer, when coupled with McCarthy's conduct and the absence of any personal reason for him to seek Mrs. Mayhue's death, clearly established by a preponderance of the evidence that appellant had solicited McCarthy to aid him in murdering the victim. Thus, McCarthy's statements were correctly admitted as those of a co-conspirator.

■ Appellant's final hearsay claim challenges the admission of requests made by Hardin to Steve Gavura following appellant's arrest. Hardin asked Gavura to misdirect the police as to why he had been in Gavura's driveway on the night of the murder, and to show the police a spot where Gavura had buried a dog rather than the body of Earl Span. Appellant asserts that these statements were erroneously admitted under the co-conspirator exception since they were not made during the conspiracy which had terminated upon appellant's arrest.

 We have previously held on several occasions that the fulfillment of the main objective of a conspiracy does not necessarily result in its termination. Where there is evidence that the conspirators originally agreed to take certain steps after the principal objective of the conspiracy was reached, or evidence from which such an agreement might reasonably be inferred, the conspiracy may be found to continue. *Commonwealth v. Pass,* 468 Pa. 36, 46, 360 A.2d 167, 171 (1976). Thus, statements made by conspirators in an attempt to conceal a completed crime may be admissible against other co-conspirators under the co-conspirator exception when the concealment of the crime was an integral part of the common design to which the conspirators agreed. *Pass,* 468 Pa. at 46, 360 A.2d at 171; *Commonwealth v. Haag,* 522 Pa. 388, 562 A.2d 289 (1989). We have held, however, that the hearsay rule no longer applies once the object of the conspiracy has been completed, and one or more of the conspirators is under arrest or in custody. *Commonwealth v. Ransom,* 446 Pa. 457, 288 A.2d 762 (1972).

In the instant case, concealment of the murder of Harlene Mayhue was clearly an integral part of the plan agreed upon by appellant and Hardin. At the time of the murder, appellant had been in contact with David Kisow for nearly four years, attempting to arrange for disposal of the body. The Commonwealth argues that in light of this agreement Hardin's statements following appellant's arrest are admissible since they were in furtherance of the ongoing agreement to conceal the crime.

In support of this position, the Commonwealth cites the cases of *Pass, Haag,* and *Commonwealth v. Wilson,* 394 Pa. 588, 148 A.2d 234 (1959). In *Pass* and *Haag,* we upheld the admission of conspirators' attempts to conceal their involvement in the murders in the respective cases on the ground that concealment of the crime had been an agreed upon part of each original plan. Similarly, in *Wilson,* this court held the original conspiracy to commit a murder/robbery to have encompassed the disposition of the proceeds of the robbery and concealment of the crime. Thus, we upheld the admission of

numerous trips, conversations, and telephone calls made in furtherance of these goals.

All of these cases, however, are distinguishable from the present case in that they dealt with the admission of acts and statements made after the fulfillment of the conspiracy's principal goal, but prior to the arrest of any of the conspirators. Under the present facts, Hardin's requests for Gavura to deceive the police about his purpose in Gavura's driveway on the night of December 15, 1986 and the burial of Earl Span were made after the arrest of appellant, and hence after the termination of the conspiracy. Such evidence was improperly admitted under the co-conspirators' exception.

Examination of the record, however, reveals the admission of this evidence to be a harmless error which does not constitute a ground for relief. Under the rule in the seminal case of *Commonwealth v. Story*, 476 Pa. 391, 406, 383 A.2d 155, 162 (1978), we will only consider an error to be harmless when the Commonwealth is able to establish beyond a reasonable doubt that the error was harmless. This burden is satisfied when the Commonwealth is able to show, (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Williams*, 524 Pa. 404, 409, 573 A.2d 536, 538 (1990) (citing *Story*, 476 Pa. at 410–415, 383 A.2d at 164–166).

The statements made by Hardin following appellant's arrest were not the only evidence introduced against appellant. Indeed, the Commonwealth introduced the testimony of Wayne Shackleford and Edward Lau regarding appellant's attempts to solicit someone to kill his wife, David Kisow's testimony regarding appellant's arrangements to dispose of the body, Steve Gavura's testimony regarding Hardin's activities and

statements on the night of the murder, and evidence of the numerous statements made by appellant and Hardin after the murder but prior to appellant's arrest, which implicated them in the murder. In the face of such overwhelming evidence, the admission of Hardin's statements after appellant's arrest could hardly be said to have contributed to the verdict. Thus, it was mere harmless error.

 Appellant's fourth allegation of error claims the trial court erred in failing to suppress evidence of the death of Earl Span on the grounds that it constituted inadmissible evidence of prior criminal activity. We have long held that as a general rule evidence of distinct crimes is inadmissible in the prosecution of another crime solely to show the accused's bad character and propensity to commit criminal acts. *Commonwealth v. Seiders*, 531 Pa. 592, 614 A.2d 689 (1992); *Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835 (1989). Such evidence, however, may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose, and not merely to prejudice the defendant by showing him to be a person of bad character. *Commonwealth v. Claypool*, 508 Pa. 198, 495 A.2d 176 (1985). As we recently stated in *Seiders:*

[E]vidence of other crimes may be admitted where there is a legitimate evidentiary purpose for such evidence.

Some of the exceptions recognized by this Court as legitimate bases for admitting evidence of a defendant's distinct crimes include, but are not limited to, (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan, or design embracing two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other; (6) to impeach the credibility of a defendant who testifies in his trial; (7) situations where a defendant's prior criminal history had been used by him to threaten

or intimidate the victim; (8) situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development ... (citations omitted).

*Seiders,* 531 Pa. 592, 614 A.2d 689 (1992) (citing *Billa,* 521 Pa. at 177, 555 A.2d 835).

Under the present facts, we find the evidence of the death of Earl Span was properly admitted under the "complete story" (res gestae) exception articulated by this court in *Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491 (1988).

In *Lark,* we reviewed a direct appeal from a judgment of sentence of death imposed following the defendant's conviction for murder of the first degree, terroristic threats, and kidnapping. The charges against the defendant arose from the murder of the Commonwealth's chief witness, the victim, Tae Bong Cho, in a robbery prosecution against the defendant. Following the murder, the robbery charges against the defendant proceeded despite the death of the witness. In June 1979, at the close of the Commonwealth's evidence, the defendant fled from justice. The trial, however, continued in the defendant's absence and he was found guilty of robbery. While at large, the defendant began threatening the Assistant District Attorney who had obtained his conviction and who was directing the search for the defendant. On January 9, 1980, the defendant was at last spotted by police. A high speed chase ensued, and was followed by a two hour standoff during which the defendant held a woman and her two children hostage. While holding his hostages, the defendant made several statements connecting him to the murder of Tae Bong Cho.

On appeal, the defendant asserted that the trial court erred in denying his motion for severance of the three charges against him on the grounds that the offenses did not arise from the same transaction, and that evidence of each offense would have been inadmissible in a separate trial for the other. In rejecting this claim, we held that the evidence of each offense was not only relevant to prove a logical connection

between the crimes, such as motive, intent, or identity, so that proof of one naturally tended to show that the accused committed the other, but also, and more important, to "complete the story" by demonstrating the history and natural development of the facts. As we stated:

> The four principle (sic) crimes (robbery, murder, terroristic threats and kidnapping) involved in this case were all linked together, along with the other threats and intimidation, and presented a clear picture of appellant's pattern of destruction and intimidation of the participants in the criminal justice system.

> The terroristic threats against Mr. Cunningham and the kidnapping of Ms. Morris and her children were clearly relevant to shed light on appellant's motive and intent in murdering Mr. Cho, in establishing his identity by showing a logical connection between the crimes and an oft-repeated pattern of appellant, and, importantly in this unique case, to show the natural development of the case and to complete the story. Indeed, the events described at trial were interwoven with and naturally developed one from the other. Appellant is a judicial nihilist. His total behavior was directed at wrecking the truth seeking function of the system which holds us accountable for our behavior.

*Commonwealth v. Lark*, 518 Pa. at 307, 543 A.2d at 499.

Just as the evidence of the various defenses in *Lark* was necessary to portray the defendant's crimes accurately, not as isolated incidents but rather as acts committed in an ongoing pattern of "judicial nihilism," the evidence of Earl Span's death was essential to complete the story behind the death of Harlene Mayhue.[10] Like the testimony of Wayne Shackleford

10. At oral argument, appellant attempted to distinguish *Lark* from the present case on the ground that the evidence of each of the offenses in that case would have been admissible in a separate trial for the others. Such an argument would appear to proceed on the premise that evidence must first fall in one of the other exceptions to the prohibition of other crimes evidence before it may be admitted under the complete story rationale. Such a condition precedent, however, would appear to have been rejected by *Seiders, supra,* in which we listed the "complete story" rationale as a separate exception, independent of the other

and Edward Lau, it provided another piece of a puzzle which, once completed, revealed Harlene Mayhue's murder to be the culmination of a series of cold, calculating, and unrelenting attempts to bring about her demise, rather than the product of an isolated instance of brutality brought on by the heat of passion. It was properly admitted.

 Appellant's final evidentiary claim alleges error in the trial court's failure to suppress his statements to police informant Wilbert Alexander while he was incarcerated awaiting trial for Mrs. Mayhue's murder, and argues violation of his sixth amendment right to counsel.[11] Our standard of review in addressing a defendant's challenge to the denial of a motion to suppress is set forth in *Commonwealth v. Cortez*, 507 Pa. 529, 532, 491 A.2d 111, 112 (1985), where we stated:

> When we review the ruling of a suppression court we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are error.

*Id.*

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the United States Supreme Court addressed the issue of the admission of a defendant's inculpatory statements to a police informant made after the defendant's indictment. *Massiah* arose out of an incident involving a defendant who was free on bail following his indictment. During the course of an automobile ride, the defendant made inculpatory statements to a co-defendant who, unbeknownst to

exceptions to the general rule against admission of other crimes evidence.

11. Appellant makes no claim under the Pennsylvania Constitution. Therefore, we address only the law as mandated by the U.S. Constitution. *Commonwealth v. Karash*, 513 Pa. 6, 518 A.2d 537 (1986).

the defendant, had agreed to act as an informant for the police. The Court subsequently held the statements to be inadmissible on the ground that the informant's deliberate attempts to elicit statements from the defendant regarding the offense with which he had been charged amounted to a secret interrogation in violation of the defendant's Sixth Amendment rights.

The holding of *Massiah* was subsequently reaffirmed in *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), and *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). In *Henry,* the Court affirmed an order of the Court of Appeals which reversed the denial of the defendant's motion to suppress inculpatory statements made by him to an FBI informant while he was incarcerated following his indictment on robbery charges. In reaching this decision, the Court held that under *Massiah,* the informant's "stimulation" of conversations with the defendant in order to "elicit" incriminating information violated the defendant's right to counsel. Likewise, in *Moulton,* the Court held that an informant's prompting of the defendant during a supposed discussion of trial strategy, by feigning an inability to remember various details of the crimes the two had committed, constituted "deliberate elicitation" impermissible under *Massiah.*

We recently addressed this issue in *Commonwealth v. Moose,* 529 Pa. 218, 602 A.2d 1265 (1992). *Moose* arose out of a defendant's challenge to a judgment of sentence of life imprisonment following his conviction for first degree murder. At issue was the admission of inculpatory statements made by the defendant, who was in the York County Jail awaiting trial on the murder charges against him, to an informant, whom the District Attorney's Office had allowed to remained unsentenced in the County jail for three years due to his propensity for obtaining confessions from other inmates. No formal agreement, however, had ever been made between the informant, known as the "monsignor," and the District Attorney's Office. We subsequently held the statements to be inadmissible. In doing so we concluded that the informant was a

Commonwealth agent due to the "implied understanding" that he would not be sentenced for his conviction for third degree murder, so long as he continued to obtain confessions. In addition, we held that the defendant's statements had been deliberately elicited by the informant, who had asked the defendant about the ownership of the knife used to kill the victim and other questions designed to extract incriminating information.

In the case now before us, appellant argues that under the *Massiah* line of cases his statements to Alexander following his indictment should be suppressed. We find this argument unpersuasive for two reasons. First, under *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), Alexander's remark to appellant that he was getting out of jail does not constitute the sort of deliberate elicitation prohibited by *Massiah* and its progeny. In *Kuhlmann,* the police placed an informant, who had previously agreed to listen to the defendant's conversations and report his remarks to the police, in the same prison cell as the defendant following the defendant's arraignment on robbery and murder charges. The informant had been specifically instructed not to ask any questions of the defendant, and did not do so. When the defendant first discussed his participation in the crime, however, the informant had remarked that the defendant's explanation for his presence at the crime scene, "didn't sound too good." The defendant later admitted the crime to the informant. The court held that the defendant's right to counsel had not been violated by the incident. In doing so, it first noted that a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to police. Rather, the defendant must demonstrate that the police and their informant took some action beyond mere listening that was designed deliberately to elicit incriminating remarks. The Court then concluded that the informant's actions did not constitute deliberate elicitation since the informant had merely listened to the defendant's "spontaneous" and "unsolicited" statements.

The investigators in this case, like the police in *Kuhlmann*, instructed Alexander to avoid talking and to let the defendant speak. It was appellant who initiated all conversations concerning the killing of potential witnesses. Like the informant in *Kuhlmann*, Alexander was a mere passive listener whose only remark to appellant concerned his own imminent release. Under *Kuhlmann*, such a remark can hardly be said to constitute the type of deliberate elicitation violative of appellant's right to counsel.

Appellant's argument also fails due to a second, more fundamental flaw. Specifically, appellant ignores the fact that under *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), *Massiah* and its progeny, which dealt with the admission of inculpatory statements concerning the crime for which the defendants had already been charged, are simply inapplicable to the present facts where the statements in question concerned a crime for which no charges had been filed against appellant.

In *Perkins*, the United States Supreme Court upheld the admission of inculpatory statements elicited by an undercover officer from a defendant concerning an unsolved murder while the defendant was incarcerated and awaiting trial on other charges. In reaching its decision, the Court held that the *Massiah* line of cases was inapplicable, since charges had not been filed on the subject of the interrogation,[12] stating,

> This Court's Sixth Amendment decisions in *Massiah v. United States*, 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199 (1964), *United States v. Henry*, 447 U.S. 264, 65 L.Ed.2d 115, 100 S.Ct. 2183 (1980), and *Maine v. Moulton*, 474 U.S. 159, 88 L.Ed.2d 481, 106 S.Ct. 477 (1985), also do not avail respondent. We held in those cases that the government may not use an undercover agent to circumvent the Sixth

12. The *Perkins* court also held that the officer's failure to give *Miranda* warnings prior to engaging in the conversation with the defendant did not violate the defendant's fifth amendment rights, since the pressures normally associated with custodial interrogation were not present when the defendant was unaware the person he was speaking to was a government agent. In the present case, appellant has not raised a 5th amendment challenge to the admission of his statements to Alexander, nor could such a claim succeed in light of *Perkins*.

Amendment right to counsel once a suspect has been charged with the crime. After charges have been filed, the Sixth Amendment prevents the government from interfering with the accused's right to counsel (citation omitted). In the instant case no charges had been filed on the subject of the interrogation, and our Sixth Amendment cases are inapplicable.

*Perkins,* 496 U.S. at 299, 110 S.Ct. at 2398.

■ Here, as in *Perkins,* the purpose of the conversations with appellant was to obtain information about an offense for which appellant had yet to be charged. Prior to his meeting with appellant on September 11, 1987, Wilbert Alexander was specifically instructed not to discuss the murder of Harlene Mayhue with appellant, but rather, to stick to the solicitation case against appellant. At the suppression hearing, the officers who placed the body wire on Alexander testified that their purpose in recording the conversation with appellant was not to obtain information about Mrs. Mayhue's murder, but rather to further investigate appellant's ongoing attempt to kill Commonwealth witnesses, a crime for which appellant had yet to be charged.[13] Thus, we find *Massiah* and its progeny inapplicable to the case at bar, and hold that statements obtained by the authorities through the lawful investigation of a crime of which the defendant has not yet been accused may be admitted at the defendant's trial on charges for which he had already been indicted at the time the statements were made.[14] Thus, the admission of appellant's statements to Wilbert Alexander did not violate his Sixth Amendment rights.

## II.

### Venue

■ Appellant's sixth claim of error contends that the trial court erred in instructing the jury that it must find venue

13. Appellant's attempts to recruit Alexander to murder witnesses clearly constituted solicitation to commit murder in violation of 18 Pa.C.S. § 905.

14. Such admission, of course, would still be conditioned upon the statements satisfying the usual rules of evidence. Here the statements were clearly admissible to show consciousness of guilt.

established in Allegheny County if it found that the transportation of Harlene Mayhue's body there was an integral part of the conspiracy when no conspiracy was charged. This argument is meritless, for it rests on the unsound premise that the victim's death occurred in Beaver County, and, that as a result, venue in Allegheny County could only be established through the transportation of the victim to Kisow's residence.

At trial, Judge Cercone instructed the jury that the Commonwealth could establish venue by proving that the victim's death occurred in Allegheny County. The Commonwealth clearly satisfied this requirement through Dr. Rozin's testimony and the introduction of the shell casings found at the Kisow residence. Thus, the trial Court would have been correct had it refused to instruct the jury on the issue of venue. *See Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973).

Nevertheless, the trial court also instructed the jury on conspiracy liability, correctly stating that were the jury to find a conspiracy existed, it could serve as the basis for establishing venue if the act of transporting the victim to Allegheny County was an integral part of the conspiracy. *See Commonwealth v. Tumolo*, 455 Pa. 424, 317 A.2d 295 (1974).

## III.

### Appellant's Death Sentence

■ Appellant next claims that the evidence presented at his sentencing hearing was insufficient to support the jury's finding of an aggravating circumstance under 42 Pa.C.S. § 9711(d)(2). We agree.

42 Pa.C.S. § 9711(d)(2) states:

**(d) Aggravating circumstances.**—Aggravating circumstances shall be limited to the following:

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

At trial, the Commonwealth introduced evidence that appellant contracted with at least three men—Wayne Shackleford, Edward Lau (through Gerald McCarthy), and Earl Span—to have his wife killed. In addition, appellant admitted on the stand at his sentencing hearing that he had paid Wayne Shackleford to kill his wife. The evidence also showed, however, that none of these individuals ever fulfilled their contractual duties, and that appellant himself committed the murder. Thus, we are now faced with an issue of first impression, namely, whether a contract to kill must be fulfilled by the offeree in order to support a finding of an aggravating circumstance under § 9711(d)(2).

In arguing that § 9711(d)(2) does not necessitate a finding of causation, the Commonwealth asserts that the plain language of § 9711(d)(2) is unambiguous in that it requires only that a defendant pay or contract to pay another person (the offeree) for the killing of the victim, not that the offeree actually commit the murder. The Commonwealth contends that in light of such plain language the letter of the law is not to be disregarded under the pretext of pursuing its spirit.

While we have never directly dealt with this issue, we addressed it indirectly in our recent holding in *Commonwealth v. Hackett,* 534 Pa. 210, 627 A.2d 719 (1993), and its companion case *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176 (1993). In each of these cases, we were presented with an automatic appeal from a judgment of sentence of death following Hackett and Spence's convictions for murder of the first degree. The murder in question arose from a conspiracy between Hackett and Spence to kill the victim's boyfriend (Gregory Ogrod). This conspiracy culminated in an attack perpetrated by Hackett and Spence upon the victim and Ogrod, which Ogrod managed to survive. Two days prior to the attack, Spence offered an individual named David Carter $5000 to do a "hit job." Carter accepted. However, when Spence and Carter met on the evening of July 30, 1986, to carry out the deed, Carter disagreed with the plan Hackett and Spence had concocted, stating "I'm out of this," and left. Hackett and Spence then took it upon themselves to commit the murder. The two were convicted and sentenced to death when the jury found the aggravating circumstances of "con-

tract to kill", § 9711(d)(2), and "placing another in grave risk of death." § 9711(d)(7).

On direct appeal the two defendants argued, inter alia, that as a matter of law there could be no aggravating circumstance for a contract killing since the victim was never the subject of such a contract. We subsequently rejected this claim on the ground that the victim had indeed been one of the subjects of the contract since Carter had been instructed to kill her if she was present at the scene. Although the defendants did not raise the causation claim now before us, we noted in dicta that "the plain meaning of § 9711(d)(2) is that once a contract for killing of the victim has been entered, § 9711(d)(2) is triggered provided causation exists." *Spence*, 534 Pa. at 233 n. 9, 627 A.2d at 1184 n. 9; *Hackett*, 534 Pa. at 225 n. 8, 627 A.2d at 727 n. 8.

■ We now adopt this interpretation of § 9711(d)(2) for three reasons. First, we agree with Justice Cappy's concurring opinion in *Hackett*, that at a minimum, causation is implied from the words of § 9711(d)(2), i.e., a contract for "the killing of the victim." *Hackett*, 534 Pa. at 225, 627 A.2d at 727 (Justice Cappy concurring).

■ In addition, we find such an interpretation to be in accord with a contextual reading of § 9711(d)(2). It is well established that whenever a court construes one section of a statute, it must read that section not by itself, but with reference to, and in light of, the other sections. *Consulting Engineers of Pa. v. State Architects Licensure Board*, 522 Pa. 204, 560 A.2d 1375 (1989). In the present case, the "plain meaning" argument put forth by the Commonwealth fails to undertake such a reading. Examination of the remaining fifteen aggravating circumstances listed under § 9711(d) reveals that each concerns a circumstance arising from or surrounding the actual transaction which resulted in the victim's death, i.e., the killing act.[15] In light of this fact we find it

15. § 9711(d) reads,
> Aggravating circumstances shall be limited to the following:
> (1) The victim was a fireman, peace officer, public servant concerned in official detention, as defined in 18 Pa.C.S. sec. 5121

Note 15—Continued

(relating to escape), judge of any court in the unified judicial system, the Attorney general of Pennsylvania, a deputy attorney general, district attorney, assistant district attorney, member of the General Assembly, Governor, Lieutenant Governor, Auditor General, State Treasurer, State law enforcement official, local law enforcement official, Federal law enforcement official or person employed to assist or assisting any law enforcement official in the performance of his duties, who was killed in the performance of his duties or as a result of his official position.

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.

(3) The victim was being held by the defendant for ransom or reward as a shield or hostage.

(4) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(5) The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(6) The defendant committed a killing while in perpetration of a felony.

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

(8) The offense was committed by means of torture.

(9) The defendant has a significant history of felony convictions involving the use or threat of violence.

(10) The defendant has been convicted of another Federal or State offense committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

(11) The defendant has been convicted of another murder, committed either before or at the time of the offense at issue.

(12) The defendant has been convicted of voluntary manslaughter, as defined in 18 Pa.C.S. sec. 2503 (relating to voluntary manslaughter), committed either before or at the time of the offense at issue.

(13) The defendant committed the killing or was an accomplice in the killing as defined in 18 Pa.C.S. sec. 306(c) (relating to liability for conduct of another; complicity), while in the perpetration of a felony under the provisions of the Act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device, and Cosmetic Act, and punishable under the provisions of 18 Pa.C.S. sec. 7508 (relating to drug trafficking sentencing and penalties).

(14) At the time of the killing, the victim was or had been involved, associated, or in competition with the defendant in the sale, manufacture, distribution or delivery of any controlled substance or counterfeit controlled substance in violation of the Controlled Substance, Drug, Device and Cosmetic Act or similar law of any other state, the

doubtful that the legislature intended § 9711(d)(2) to be the only circumstance which could arise completely independently of the killing of the victim. Rather, we find the requirement of a causal link between the contract to kill and the death of the victim is clearly mandated by a contextual interpretation of § 9711(d)(2).

Finally, we find that a requirement of causation under § 9711(d)(2) is in accord with the well established principle that causation constitutes an essential element of the offense of murder which the Commonwealth must prove beyond a reasonable doubt, and which "cannot be established in the criminal context on a 'but for' or civil law proximate cause basis." *Hackett*, 534 Pa. at 225, 627 A.2d at 727 (Justice Cappy concurring) (citing Burkoff, *Criminal Offenses and Defenses in Pa. (2d ed.)*, p. 196. *See also, Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961); *Commonwealth v. Stafford*, 451 Pa. 95, 301 A.2d 600 (1973).

Under the present facts, none of the three contracts to kill caused any harm whatsoever to the victim. All of their agreements had clearly been breached and abandoned months before Mrs. Mayhue was murdered. Rather, the sole cause of this brutal crime was appellant's intent to kill his wife. Thus, the evidence in the present case is insufficient to support the finding of an aggravating circumstance under § 9711(d)(2). Since this issue is dispositive of appellant's remaining death sentence claims, we need not address them.

Note 15—Continued
District of Columbia or the United States, and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. sec. 306(c), and the killing resulted from or was related to that association, involvement or competition to promote the defendant's activities in selling, manufacturing, distributing or delivering controlled substances or counterfeit controlled substances.

(15) At the time of the killing, the victim was or had been a nongovernmental informant or had otherwise provided an investigative, law enforcement or police agency with information concerning criminal activity and the defendant committed the killing or was an accomplice to the killing as defined in 18 Pa.C.S. sec. 306(c), and informant or in providing information concerning criminal activity to an investigative, law enforcement or police agency.

(16) The victim was a child under 12 years of age.

Accordingly, the sentence of death is vacated and the case is remanded for imposition of a life sentence pursuant to 42 Pa.C.S. § 9711(h)(4).

LARSEN, J., did not participate in the decision of this case.

MONTEMURO, J., who was an appointed Justice of the Court at the time of argument, participated in the decision of this case in his capacity as a Senior Justice.