720 A.2d 679

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Christopher WILLIAMS, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 8, 1997.

Decided Oct. 2, 1998.

1

6

8

David Rudenstein, Philadelphia, for Christopher Williams.

Catherine Marshall, Norman Gross, Philadelphia, for the Com.

Robert A. Graci, Harrisburg, for the Com. Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## *OPINION*

CAPPY, Justice.

This is a direct appeal from the judgments of three sentences of death imposed on Christopher Williams ("Appellant").[1] For the reasons expressed in this opinion, we now affirm.

Appellant was charged with murder and related offenses in connection with the killings of Gavin Anderson, Kevin Anderson (collectively, "the Anderson brothers"), and Otis Reynolds.[2] The jury found Appellant guilty of three counts of

---

1. Sentences of death are subject to automatic review by this court. 42 Pa.C.S. § 9711(h)(1).

2. Appellant was tried jointly with his co-conspirators, Rick Bennett ("Bennett") and Theopolis Wilson ("Wilson").

first degree murder [3], three counts of robbery,[4] three counts of criminal conspiracy,[5] corrupt organizations,[6] and possessing an instrument of crime.[7] At the penalty phase of the trial, the jury found that there were three aggravating circumstances: that the murders were committed during the commission of a felony (the felony being burglary);[8] that defendant had a significant history of convictions of felonies involving the use of threat of violence against a person;[9] and defendant had been convicted of another murder.[10] The jury recognized "family considerations" as a mitigating factor.[11] Upon weighing the aggravating and mitigating circumstances, the jury fixed Appellant's penalty for each murder at death.

The first of Appellant's issues we will review is that the three first degree murder convictions were not supported by sufficient evidence. In reviewing the sufficiency of the evidence, the test we apply is "whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense beyond a reasonable doubt." *Commonwealth v. Hughes*, 536 Pa. 355, 639 A.2d 763, 766 (Pa.1994).

In order to prove murder of the first degree, the Commonwealth must prove that the defendant acted with a specific intent to kill. 18 Pa.C.S. § 2502(d). The Commonwealth must show that a human being was unlawfully killed, that the person accused did the killing, and that the killing was done in an intentional, deliberate, and premeditated man-

3. 18 Pa.C.S. § 2502(a).
4. 18 Pa.C.S. § 3701.
5. 18 Pa.C.S. § 903.
6. 18 Pa.C.S. § 911.
7. 18 Pa.C.S. § 907.
8. 42 Pa.C.S. § 9711(d)(6).
9. 42 Pa.C.S. § 9711(d)(9).
10. 42 Pa.C.S. § 9711(d)(11).
11. This mitigating circumstance was found pursuant to 42 Pa.C.S. § 9711(e)(8) ("[a]ny other evidence of mitigation....")

ner. *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624 (Pa.1991). The element which distinguishes first degree murder from all other degrees of homicide is the presence of a premeditated, deliberate, and willful intent to kill. *Commonwealth v. Moore,* 473 Pa. 169, 373 A.2d 1101 (Pa.1977).

The evidence presented at trial established that Appellant was the leader of a gang that robbed, and would then kill, other drug dealers. N.T., 7/26/93, at 13–17. Early in September of 1989, Appellant went to New York City to meet the Anderson brothers, who were known drug traffickers. Appellant invited the Anderson brothers to Philadelphia under the pretext that he would sell them some weapons.

James White ("White"), who had been a member of Appellant's gang, testified for the Commonwealth that on September 24, 1989, Appellant told White that he needed a van for a "job". N.T., 7/26/93, at 49. The next day, White and co-defendant Bennett drove the van White had stolen to the Germantown section of Philadelphia where they met Appellant. Appellant explained to White that they were going to rob three New York drug dealers, who were meeting with Appellant as they believed that Appellant would sell them some guns. N.T. 7/26/93, at 48–52.

Co-defendant Wilson was responsible for bringing the three intended victims to the Germantown location. When Wilson called to say that they were on their way, Appellant passed out guns to his gang members. Appellant retained two guns for himself, and gave a shotgun to White, and a .357 automatic to co-defendant Bennett. N.T., 7/26/93, at 53.

After the victims arrived at the apartment, Appellant and the members of his gang drew their weapons and pointed them at the victims while Appellant demanded that the victims turn over their money. Appellant and other members of his gang eventually removed one of the victims from the apartment to retrieve more of the victims' money. After retrieving the cash, Appellant shot that victim. N.T., 7/26/93, at 62. Appellant and his gang members continued questioning the other two victims, asking them for more money. When they

were not forthcoming with producing more money, Appellant shot the other two victims. N.T., 7/26/93, at 65–66.

Furthermore, the forensic evidence introduced at trial showed that Reynolds died due to two gunshot wounds to his face, one which was inflicted from a distance of no more than twelve inches. N.T., 7/28/93, at 146–148. Gavin Anderson was also shot twice in the face, once at close range; he also suffered a gun shot wound to the back of the neck. N.T., 7/28/93, at 150–151. Finally, the evidence established that Kevin Anderson died due to two gunshot wounds to the head. N.T., 7/29/93, at 4–6.

This evidence, when taken in the light most favorable to the Commonwealth as verdict winner, established that Appellant concocted a plan to lure the victims to a place where he could interrogate them at his leisure, rob them of any available money and goods, and then shoot them. The evidence also shows that Appellant executed that plan, killing all three victims. The evidence of record is more than sufficient to establish that Appellant was guilty of three counts of first degree murder.

Appellant also contends that the verdicts were against the weight of the evidence. It is axiomatic that the weight of the evidence is exclusively for the finder of fact who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Johnson*, 542 Pa. 384, 668 A.2d 97, 101 (Pa.1995). Furthermore, an appellate court is restrained from substituting its judgment for that of the finder of fact. *Id.* Thus, we may reverse the decision of the lower court only where the defendant has shown that the fact-finder overlooked such a preponderance of the evidence so that the verdict shocks the conscience. *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 97 (Pa.1995).

Appellant claims that the Commonwealth's case rested primarily on the testimony of White. He asserts that since White admitted to killing six people and was also shown on the witness stand to be a habitual liar, then any verdict based

primarily on White's testimony *ipso facto* is against the weight of the evidence. In making this argument, Appellant does concede that this court has long stated that credibility is left to the fact finder. *See, e.g., Commonwealth v. Patton,* 546 Pa. 562, 686 A.2d 1302, 1305 (Pa.1997). Yet, he urges us to ignore that precept and independently determine White's credibility. We decline to do so. We believe that credibility determinations are properly left to the finder of fact, as it is that entity which has the opportunity to examine those tell-tale signs of credibility – such as the physical appearance, demeanor, and cadence of speech of the witness – which are unavailable to an appellate court on the face of a cold record.

Furthermore, a review of all of the evidence presented at trial leads us to the conclusion that Appellant's weight of the evidence claim must fail. The verdicts were consistent with the evidence presented at trial, and we find no basis on which to conclude that the verdicts were so contrary to the evidence that they shock the conscience. *Walker, supra.*

Next, Appellant contends that the trial court judge erred when he replaced two members of the jury with alternate jurors.[12] In one instance, Juror No. 11 failed to appear for duty one morning. The judge waited for fifteen minutes, and then requested that the court officer telephone the juror; there was no answer. N.T., 7/27/93, at 1–7. To prevent further delay, the judge dismissed Juror No. 11 and seated an alternate.

The trial court also replaced Juror No. 7. That juror had informed the court during voir dire that she had previously scheduled and paid for a trip that was to commence on August 7, 1993. The trial court judge declined to dismiss her for cause at that point, stating that "we should be done" by August 7. N.T., 7/20/93, at 73. The trial, however, did not

12. This is the first of several claims which Appellant did not preserve below; these issues would usually be waived. Yet, in direct appeals from sentences of death, we relax our waiver rule and review the substance of the claims raised. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 955 n. 19 (Pa.1982). Therefore, we will address the merits of these issues.

proceed as quickly as the trial court judge had thought it would, and on August 4, 1993, when it was clear that the trial would not be over prior to August 7, 1993, the judge dismissed Juror No. 7 and seated an alternate in her place. N.T., 8/04/93, at 4.

Pursuant to Pa.R.Crim.P. 1108(a), a trial court may seat an alternate juror whenever a principal juror becomes unable or disqualified to perform his duties. The standard of review for examining a trial court judge's decision to seat an alternate juror is abuse of discretion. *Commonwealth v. Jacobs,* 536 Pa. 402, 639 A.2d 786 (Pa.1994). Application of this standard to the facts at hand shows that in neither instance did the trial court judge abuse his discretion. As to Juror No. 11, the unexplained tardiness of one juror was delaying a complicated capital case in which three co-defendants were on trial. We cannot say that the trial court judge, under such circumstances, abused his discretion in dismissing Juror No. 11. We also cannot say that the trial court judge abused his discretion in dismissing Juror No. 7. The judge stated in voir dire that he was not going to strike Juror No. 7 for cause because he believed that the trial would be done prior to the date on which her vacation was to begin. Events did not unfold as the judge had anticipated they would, and in light of changed circumstances, he felt it incumbent upon himself to dismiss Juror No. 7. We believe that this was within the discretion of the judge, and see no reason to reverse on this basis.

Appellant's next claim is that the trial court erred when it did not sever his trial from that of his co-defendants because Appellant's defense was on a "collision course" with the defenses of his two co-defendants. He claims that his defense conflicted with those presented by his co-defendants because they planned to introduce evidence of their good character, while Appellant would introduce no character evidence. Appellant's brief at 57–58. In a related claim, Appellant contends that trial counsel was ineffective for failing to argue that severance was warranted.

14

 We begin our analysis of this issue by noting that where, as in the present matter, several defendants are charged with conspiracy, there is a strong preference for joint rather than separate trials. *Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1372 (Pa.1991). "Separate trials of co-defendants should be granted only where the defenses of each are antagonistic to the point where such individual differences are irreconcilable and a joint trial would result in prejudice." *Commonwealth v. Lambert,* 529 Pa. 320, 603 A.2d 568, 573 (Pa.1992).

 With this standard in mind, we reject Appellant's position. The fact that Appellant's co-defendants presented evidence of their reputation for good character, while Appellant introduced no such evidence, does not mean that their defenses were antagonistic. In fact, the jury could either accept or reject the character evidence offered by Appellant's co-defendants without having their judgment of Appellant affected in any fashion. As the defenses presented by Appellant's co-defendants were virtually independent of Appellant's defense, we conclude that the trial court did not err when it refused to sever Appellant's trial; similarly, we also reject Appellant's ineffectiveness claim as lacking merit.

 Appellant next raises several claims of ineffective assistance of counsel. To establish that counsel was ineffective, it is Appellant's burden to establish three points. First, Appellant must show that the underlying claim is of arguable merit. *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 356 (Pa.1995). Second, Appellant must prove that counsel's action or inaction was not grounded on any reasonable basis. *Id.* In determining whether counsel's action was reasonable, we do not question whether there were other more reasonable courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (Pa.1987). Finally, Appellant must establish that "but for the act or omission in question, the outcome of the proceedings would have been different." *Tra-*

*vaglia,* 661 A.2d at 357. We emphasize that counsel is presumed to be effective. *Commonwealth v. Cross,* 535 Pa. 38, 634 A.2d 173 (Pa.1993).

 Appellant's first ineffectiveness claim is that his trial counsel was ineffective for failing to object to a statement made by Detective Ancel while the detective was being cross-examined by the attorney for co-defendant Wilson. The statement to which Appellant is referring was made by Detective Ancel in response to the question as to why the defendants were arrested. Detective Ancel answered that they were arrested because "in our estimation, Christopher Williams and the other defendants and other associates were involved in numerous, as much as two dozen homicides." N.T., 7/29/93, at 133. Appellant claims that counsel should have objected that this statement was non-responsive.

Obviously, this response was not helpful to Appellant's position. Yet, the fact that a witness has said something unfavorable to one's client does not give an attorney a basis upon which to object. The answer given by Detective Ancel was clearly in direct response to the question posed to him. Thus, this claim is meritless.[13]

 Next, Appellant claims that his trial counsel was ineffective when he failed to object to certain testimony given by Marian Anderson ("Ms.Anderson"), the sister of the two murdered Anderson brothers. Appellant focuses on that portion of Ms. Anderson's testimony where she described how she recognized Appellant when she walked into the courtroom to testify at the trial. Ms. Anderson testified that a few weeks prior to the murder of her brothers, Appellant had come to New York City to meet with her brothers. She then stated that she had not seen Appellant again until four years later, when she entered the courtroom to attend his trial for the

13. Appellant also raises a brief argument that Detective Ancel's statement amounted to lay testimony on the ultimate issue since Detective Ancel stated that Appellant was guilty of the murders in question. This is specious. Detective Ancel's comment indicated to the jury merely that the police suspected that Appellant was involved in approximately two dozen homicides; he expressed no comment on Appellant's guilt.

murder of her brothers. She stated that when she saw Appellant in the courtroom, she and Appellant stared at each other. Appellant then turned around to face away from Ms. Anderson and put his head down on the table. Ms. Anderson testified that in the process of viewing Appellant, she positively identified Appellant as being the man who had met with her brothers a few short weeks before their murders.

Appellant now contends that counsel should have objected to this statement as it unfairly implied to the jury that Appellant was guilty. Appellant contends that any probative value that this statement might have had as an admission was far outweighed by its prejudicial impact. This argument lacks merit as Ms. Anderson's testimony was admitted for purposes of explaining her identification of Appellant, and not to show that Appellant displayed consciousness of guilt. Furthermore, Ms. Anderson's complete recitation of how she recognized Appellant was critical to establishing the credibility of her identification to the jury considering the lapse of time between her brief introduction to Appellant and her viewing him four years later at his trial. Thus, we find that the probative value of Ms. Anderson's testimony outweighed any prejudicial impact. Appellant's ineffectiveness claim therefore fails as an objection would have been fruitless.

Appellant's next claim of error is that the trial court improperly excluded evidence that other individuals had a motive to kill the three victims. The witnesses proffered by Appellant would have testified that they had heard that unnamed individuals had been beaten, shot, and robbed by the three victims. Appellant claims that this evidence was admissible since it tended to show that these unnamed individuals would have had a motive to kill the three victims, thus undermining the Commonwealth's case against Appellant. This argument is specious. The proffered testimony was rank hearsay and highly speculative. The trial court therefore properly excluded it.

Appellant also raises several claims of error in connection with the testimony of Craig Vaughn ("Vaughn"), a witness

called by co-defendant Wilson. Prior to trial, Vaughn and White were fellow prison inmates. White made Vaughn his confidant, describing the details of the triple homicide to him. Vaughn, in turn, made White's admission the subject of his testimony at the trial.

■ Appellant's first claim of error is in connection with Vaughn's statement that although White had told Vaughn that he and a fellow gang member named "Chris" from Germantown had killed three men from New York City, White had never named co-defendant Wilson as another participant in the crime. N.T., 7/29/93, at 174–175. Appellant claims that this statement constituted inadmissible hearsay.

This claim must be rejected. As pointed out by the Commonwealth, co-defendant Wilson did not offer this evidence for the truth of the matter asserted. Rather, co-defendant Wilson utilized this testimony as a prior inconsistent statement, showing to the jury that although White named co-defendant Wilson as a participant in the crime at the time he made his statement to the police, he did not identify Wilson as a participant in the crime when he admitted his involvement in the crime to Vaughn. Any hearsay objection lodged by defense counsel would have been overruled. Therefore, Appellant's ineffectiveness claim fails as it lacks merit.

Next, Appellant states that the trial court erred when it refused to strike Vaughn's testimony that White had stated that he viewed Appellant as "be[ing] like an Aaron Jones". N.T., 7/29/93, at 191. Appellant argues that Jones "is one of the most notorious killers in Philadelphia history," [14] and that the court erred in not granting Appellant's motion for a mistrial. Appellant argues in the alternative that even if a mistrial had not been warranted, at minimum the trial court should have *sua sponte* given a curative instruction. In a related claim, Appellant asserts that trial counsel was ineffective when he failed to request a curative instruction.

14. Jones had been the leader of a Philadelphia gang known as the "Junior Black Mafia". *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 499 (Pa.1995). Jones is presently under a sentence of death.

18

A mistrial is granted "only where an event prejudicial to a defendant occurs at trial and where the unavoidable effect of that event it to deprive the defendant of a fair trial." *Commonwealth v. Brown*, 544 Pa. 406, 676 A.2d 1178, 1184 (Pa.1996). A trial court's denial of a motion for a mistrial shall not be reversed unless the appellate court determines that the trial court abused its discretion. *Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 431 (Pa.1994). We find that the trial court did not abuse its discretion here. The trial court judge noted that Vaughn's remark was so unintelligible that he did not believe "the jury picked up on it." N.T., 7/29/93, at 223. Also, he was unconvinced that the name of Aaron Jones was so notorious. N.T., 7/29/93, at 223. For these same reasons, we find that the trial court did not err when it failed to give, *sua sponte,* a curative instruction.

Similarly, Appellant's claim that counsel was ineffective for failing to request a curative instruction also fails. Trial counsel could have decided against requesting a curative instruction as he wished to avoid emphasizing damaging testimony which might have gone unnoticed by the jury. Counsel thus possessed a reasonable basis for failing to request an instruction. *See Commonwealth v. Allen,* 501 Pa. 525, 462 A.2d 624 (Pa.1983) (counsel cannot be deemed ineffective for failing to pursue an action which would not inure to the benefit of his client).

Appellant next claims that the trial court improperly limited the scope of his cross-examination of Vaughn. Appellant repeatedly questioned Vaughn about whether he was a paid informant; each time, Vaughn unequivocally denied that he was a paid informant. N.T., 7/29/93, at 217–218. Appellant then asked how much Vaughn had been paid. N.T., 7/29/93, at 218. The Commonwealth at this juncture objected, and the trial court sustained the objection. We find that the trial court was correct in sustaining this objection as Appellant's question had been repeatedly asked and answered.

Appellant's next claim of error concerns the testimony of David Lee ("Lee"). Lee testified that he sold guns and

other weapons paraphernalia to Appellant and his gang members from 1988 to 1990.[15] At trial, Appellant objected that any testimony Lee would give about sales to co-defendant Wilson in 1990, after Appellant was incarcerated, could not be admitted against him. Appellant reasoned that such evidence was irrelevant to establishing his guilt in any of the crimes of which he stood charged because he was incarcerated at the time the events transpired, and thus any conspiracy had dissolved. Appellant therefore concludes that the 1990 sales to Wilson could not be attributed to Appellant, and that admitting this evidence against Appellant constituted reversible error.

There is support for the proposition that once a conspirator has been arrested, he can no longer be said to be a participant in the conspiracy. *Mayhue*, 639 A.2d at 433. Furthermore, we can find nothing in the record which indicates that the Commonwealth established at trial that Appellant was somehow still involved in the conspiracy from his jail cell. Therefore, we find that it was error for the trial court to admit the evidence of the 1990 gun sales against Appellant.

That determination, however, is not the end of our analysis. We must now examine whether this error was harmless. Harmless error is established where either the error did not prejudice the defendant; or the erroneously admitted evidence was merely cumulative of other untainted evidence; or where the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 162 (Pa.1978).

Here, the properly admitted evidence showed that Lee had illegally purchased guns for Appellant and his gang from 1988 up through Appellant's arrest in December of 1989. At trial, Lee recounted some dealings he had with Appellant personally, including one interaction where Appellant requested that

15. Lee's testimony was used primarily to prove that the defendants were guilty of the corrupt organizations charges.

Lee purchase for Appellant an AK–47 and some hand grenades. N.T., 7/27/93, at 62. Furthermore, White testified that the money obtained from robbing and killing drug dealers was used to purchase these illegal guns. We find that all of this properly admitted evidence so overwhelmingly established Appellant's guilt of the corrupt organizations charge, and the prejudicial effect of the error of admitting the evidence that Lee sold yet more guns to Wilson after Appellant's incarceration was so minor in comparison, that the error was harmless beyond a reasonable doubt.

As his last argument in connection with the presentation of evidence at the guilt phase of his trial, Appellant contends that the trial court erred when it failed to sustain defense objections to the Commonwealth's cross-examination of co-defendant Bennett since the Commonwealth invited him to speculate on what was going on in White's mind at a particular time.

Bennett's statement on which Appellant focuses was not elicited by the Commonwealth on cross-examination, but rather was part of a prior statement made by him to the police. Among other events discussed in his statement to the police, Bennett recounted details of the robbing and shooting of a drug dealer named David Perez ("Perez") which occurred several months prior to the triple homicide at issue in the matter *sub judice*. At trial, Bennett's account of the criminal activity against Perez differed from the one he had previously given to the police. The Commonwealth therefore read portions of that prior statement into the record at trial in order to impeach Bennett.

Appellant claims that the trial court erroneously permitted part of this statement to be introduced into evidence. The particular portion of the statement which Appellant claims should have been excluded is when Bennett allegedly speculated as to what White meant when he told Bennett, the day after the Perez crimes, that "we should have done it the night I called [Appellant]." N.T., 8/02/93, at 131. Bennett immediately followed up on this comment by stating to the police that

he "figured [that when White made this comment] he meant that [Appellant] should have done what he did on the day [White] called him." N.T., 8/02/93, at 132. Appellant focuses on the word "figured" and urges this court to find that the use of this word established that Bennett was speculating as to what White meant by that comment and that admitting this speculation into evidence constituted reversible error.

We reject Appellant's argument as we do not find that Bennett's statement to the police was speculative in nature. The follow-up comment by Bennett added nothing to his account of the words White uttered; rather, it merely reiterated the substance of White's comment. Although Appellant focuses heavily on Bennett's usage of the term "figured," we do not find that the presence of that word miraculously makes the rest of a witness' statement into one which is probing the mindset of the speaker. Thus, we do not find that the jury was presented with any improper speculative testimony.

Appellant also raises several claims of error in connection with the closing argument at the guilt phase of trial. His first claim is that the trial court improperly instructed the attorneys to refrain from giving their opinion on the law to the jury in their closing arguments. The trial judge reasoned that in such a complicated case, where their were multiple co-defendants charged with dozens of crimes, having the four attorneys argue the law would serve only to confuse the jury. N.T., 8/03/93, at 10–11. None of the attorneys objected to the judge's instruction on this point.

Now, however, Appellant complains that the judge abused his discretion in so directing the attorneys. Appellant claims that had he been allowed to argue the law, he would have argued to the jury that, at most, he was guilty of second degree murder, rather than first degree murder. This argument is specious as it is beyond peradventure that it is the role of the trial court to instruct the jury as to any points of law applicable to the case. *Commonwealth v. Gwaltney*, 479 Pa. 88, 387 A.2d 848, 849 (Pa.1978). In a complicated case such as this, we cannot say that the trial court abused its

discretion when it placed the ability to discuss the law solely in its own hands.[16]

▮▮▮▮ Next, Appellant claims that the trial court improperly sustained a Commonwealth objection to Appellant's comment in closing that the Commonwealth had failed to call Rasheeda Salaam ("Salaam"), the girlfriend of White. The Commonwealth objected to this statement on the basis that Salaam was available to both parties to call.

Appellant does not attempt to attack settled case law which states that where a witness is available to both the defense and the Commonwealth, then the jury is not allowed to draw an adverse inference from the failure of one of the parties to call that witness. *See Commonwealth v. Manigault*, 501 Pa. 506, 462 A.2d 239, 241 (Pa.1983). Rather, he complains that the tenor of his closing argument was misunderstood as he "was not asking the jury to assume an adverse inference from the Commonwealth's failure to call Salaam." Appellant's brief at 40. Therefore, he claims, the Commonwealth's objection should have been overruled.

Appellant's account of his closing argument is belied by the record. Immediately prior to Appellant stating that the Commonwealth had failed to call Salaam, Appellant stated to the jury that White's account was not corroborated. N.T., 8/03/93, at 47. Clearly, Appellant was referencing the absence of Salaam, a witness who could corroborate White's account, so that the jury would make an adverse inference regarding her absence. Thus, the trial court properly sustained the Commonwealth's objection.

Appellant's next claim of error is that the prosecutor engaged in misconduct in his closing statement at the guilt phase

16. We also note that Appellant's claim that he wanted to argue to the jury that he was guilty, at most, of second degree murder, is a spurious one. Throughout his trial, Appellant's sole defense was that he was innocent of the crimes charged. Considering that this was the defense crafted throughout the guilt phase of the trial, it would have been most illogical for trial counsel to then argue at summation that his client, at most, was guilty of second degree murder.

of trial. In assessing this claim of prosecutorial misconduct, we must

> determine whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding . . . and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury.

*Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1377 (Pa.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) (citations omitted). *See also Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663, 671 (Pa.1992) (the Commonwealth is allowed to press its case with "logical force and vigor.")

▮ Appellant asserts that the prosecutor engaged in misconduct when he told the jury that "[i]n the end, ladies and gentlemen, get angry. Get angry." Appellant is apparently arguing that the prosecutor improperly exhorted the jury to base its decision upon unfettered passion, rather than upon the facts as presented at trial.

A review of the entirety of the statement, however, shows that the prosecutor did not urge the jury to premise its verdict on an improper basis. Rather, he stated to the jury:

> In the end, ladies and gentlemen, get angry. Get angry. I'm not asking you to get angry at them. I'm not asking you to get angry at James White, but if you must get angry at somebody, get it out of your system. Let decent common sense and logic to take over.
>
> If I'm pleading with you to use your reason, I am pleading with you to be fair, yes, I am pleading with you. I am asking you. I am urging you, and I'm begging you to use your common sense. That is all.

N.T., 8/03/93, 171–172.

Rather than exhorting the members of the jury to come to a verdict based upon an unprincipled vengeance, the prosecutor

instead told them to put aside their anger and arrive at their verdict through logic and common sense. This certainly did not constitute prosecutorial misconduct.

Appellant's next claims of error concern his summation which he personally delivered at the end of the penalty phase of the trial. After the defense had presented its case in the penalty phase, Appellant's trial counsel made the request on behalf of Appellant that Appellant be allowed to make his own closing argument at penalty phase. At that juncture, the prosecutor alerted the court that Appellant had been allowed to deliver his closing argument in another homicide case, and had misused this opportunity by asserting to the jury that the prosecutor was notorious for getting innocent people convicted. The trial court then conducted a colloquy, in which it warned Appellant that if he chose to present his own closing argument, then his lawyer would not be allowed to argue. N.T., 8/9/93, at 59. Furthermore, Appellant would have to confine himself to the issues raised at the penalty phase and would not be allowed to level personal criticisms against the prosecutor. N.T., 8/9/93, at 60–62. The trial court also noted that there would be sanctions if Appellant violated these instructions.

Immediately after beginning his summation, Appellant told the jury that the prosecutor had a reputation for "doing things to people when there is no reason at all." N.T., 8/9/93, at 76. The court at this juncture informed the jury of its prohibition against irrelevant argument, and warned Appellant that another such violation might result in his removal from the courtroom. N.T., 8/9/93, 76–78. Moments later, the defendant rhetorically asked the jurors why he had not been permitted to present certain alleged witnesses at the guilt phase of his trial and stated that his trial had been unfair as a result. N.T., 8/9/93, at 80–81. Once again, the trial court intervened, stating that no relevant evidence had been excluded and that Appellant could exercise his right to appeal if he believed his trial had been unfair. N.T., 8/9/93, 82–83. Ultimately, the trial court ordered Appellant to sit down. N.T., 8/9/93, at 84. Appellant continued to assert that he had been

treated unfairly, and stated that "God is going to seek you all." N.T., 8/9/93, at 85.

Appellant's first claim of error in connection with this closing argument is that the trial court should not have granted his request that he be allowed to deliver his own closing argument. Appellant does not contend that he failed to understand the import of what he was requesting to be allowed to do. Rather, he contends that it was statutorily impermissible for him, as a lay person, to present his own closing argument. He relies on 42 Pa.C.S. § 9711(a)(3), which states that "after the presentation of evidence, the court shall permit counsel to present argument for or against the sentence of death." Appellant claims that since he was not his own counsel, then he should not have been allowed to speak on his own behalf. This is specious. That provision merely sets forth the rule that closing argument shall be permitted at the close of evidence at the penalty phase. Nothing in § 9711(a)(3) states that a capital defendant may not speak on his own behalf.[17]

Next, Appellant argues that assuming that § 9711(a)(3) is not violated when a lay person is allowed to present his own closing argument, then the trial court in this matter erred when it interrupted Appellant's presentation of his statement. Appellant admits that his closing statement was not particularly relevant, but asserts that as such it could only cause harm to himself. He further contends that whatever misconduct Appellant would have committed had he been allowed to continue could have been cured by cautionary instructions. This is an outrageous argument. Contrary to Appellant's claim, it would not have been proper for the trial court to allow Appellant to make irrelevant, inflammatory

17. The Commonwealth also argues that if § 9711(a)(3) allegedly precludes a capital defendant from speaking on his own behalf, then the statute "necessarily would be void as unconstitutional." Commonwealth's Brief at 15. Because we determine that § 9711(a)(3) contains no such prohibition against a defendant speaking on his own behalf, we need not address this argument.

comments to the jury. Therefore, Appellant is entitled to no relief on this claim.

 Next, Appellant claims that the trial court erred when it informed the jury that Appellant had a right to appeal to an appellate court if he believed he had not received a fair trial. Appellant now claims that this statement told the jurors that they had no responsibility for determining whether the death penalty should be imposed on Appellant, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

In *Caldwell*, the prosecutor at the penalty phase of a capital case led the jury "to believe that the responsibility for determining the appropriateness of the defendant's death rests" with the appellate system. *Caldwell*, 472 U.S. at 329, 105 S.Ct. at 2639, 86 L.Ed.2d at 239–40. The United States Supreme Court stated that this was impermissible. The Court stressed that in order for a death sentence to be reliable, the jury must be informed in no uncertain terms that it had the "truly awesome responsibility of decreeing death for a fellow human...." *Id.* at 329–330, 105 S.Ct. at 2640, 86 L.Ed.2d at 239–40 (citations omitted). *Accord Commonwealth v. Baker*, 511 Pa. 1, 511 A.2d 777 (Pa.1986).

The trial court judge's comments did not violate the dictates of *Caldwell* as he said nothing which informed the jury that the responsibility for fixing the penalty for Appellant's crimes rested with the appellate courts, and not with them. Rather, the court informed the jury that had there been any errors in the guilt phase of trial then Appellant could argue those claims in an appellate court. The judge in no fashion minimized the role the jury played in determining Appellant's penalty. Thus, this issue is meritless.

 Finally, Appellant claims that the trial court should have ordered Appellant's trial counsel to present closing argument. In a related argument, Appellant claims that counsel was ineffective for failing to request that he be allowed to continue Appellant's summation.

This argument is specious. Appellant was informed that if he elected to deliver his own closing statement, he could not then also have his counsel speak on his behalf. Appellant indicated that his understood this term and accepted it. He cannot now be heard to complain that the trial court erred when it enforced the terms of the agreement. Appellant's related ineffectiveness claim also fails as the claim lacks merit.

Finally, we must review the imposition of the sentences of death to determine whether they meet the criteria set forth in 42 Pa.C.S. § 9711(h)(3). Pursuant to that statute, we have the duty to affirm a sentence of death unless we determine that:

> (i) the sentence of death was the product of passion, preju-dice or any other arbitrary factor;
> (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or
> (iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.[18]

42 Pa.C.S. § 9711(h)(3).

We find nothing in the record to indicate that the sentences were the product of any arbitrary factor. The record amply supports the finding of the three aggravating circumstances.[19] There was extensive testimony that Appellant committed the triple homicides as the denouement to his robbing the three victims, thus establishing that the murders were committed during the commission of a felony. Furthermore, the Commonwealth introduced into evidence at penalty

18. Recently enacted legislation struck 42 Pa.C.S. § 9711(h)(3), which provides for proportionality review, as well as that part of § 9711(h)(4) which references proportionality review. Act of June 25, 1997, No. 28, § 1 ("Act 28"), effective immediately. This court, however, will contin-ue to undertake a proportionality review in cases where the death sentence was imposed prior to the effective date of Act 28. *Common-wealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (Pa.1997).

19. As stated *supra,* the three aggravating circumstances found by the jury were: the murders were committed during the commission of a felony (the felony being burglary); Appellant had a significant history of convictions for violent felonies; and Appellant had been convicted of another murder.

28

phase that Appellant had been convicted of first degree murder, robbery, kidnapping, and other crimes related to the kidnapping, robbery, and murder of Michael Haynesworth. That evidence supports the jury's finding that Appellant had a significant history of convictions for violent felonies and that he had been convicted of another offense for which a sentence of life imprisonment or death was imposable.

Finally, we turn to examine whether the sentences of death imposed on Appellant are proportional with other sentences imposed on individuals convicted of first degree murder in which similar aggravating and mitigating factors are present. After reviewing the data compiled by the Administrative Office of the Pennsylvania Courts, we find that the sentences imposed upon Appellant are not disproportionate to the sentences imposed on other similarly situated defendants.

For the foregoing reasons, the judgments of the sentences of death are affirmed.[20]

**20.** The Prothonotary of the Supreme Court is directed to transmit, within ninety (90) days, the full and complete record of the case *sub judice* to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).