Affirmed and Memorandum Opinion filed August 15, 2006








Affirmed and Memorandum Opinion filed August 15, 2006.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-00525-CR

____________

 

JOSEPH ARCENEAUX, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 232nd
District Court

Harris County, Texas

Trial Court Cause No. 964,048

 



 

M E M O R A N D U M  O P I N I O N

A jury found appellant, Joseph Arceneaux, guilty of murder
and assessed punishment at thirty years= confinement.  In
one point of error, appellant asserts the evidence is factually insufficient to
support his conviction.  We affirm.

Summary of Evidence








The tension between Terrence Wimbley (AWimbley@) and appellant
began one or two weeks before Wimbley=s death, when the
two men were involved in a fist fight at DT=s, a pool hall. 
Appellant=s brother, Roy Arceneaux (ARoy@), had been
gambling with three other menCWimbley, ANugget,@ and ARick.@  Roy called
appellant and asked him to come to the pool hall.  Appellant arrived with
another friend, ACed.@  Appellant bet
with Wimbley on a game of pool between Roy and ANugget.@  Roy lost, and
appellant paid Wimbley $50.00.  Appellant testified Wimbley became angry after
appellant suggested he and Wimbley bet on a game between themselves.  Roy
testified Wimbley stood at the bar and Asaid several
things@ for about thirty
minutes, threatening appellant.  Wimbley finally ran up like he was going to
hit appellant, but appellant hit Wimbley twice.  Wimbley pulled out a knife,
and then appellant pulled out a knife.  Roy broke up the fight, and Wimbley
told appellant he was going to Aget his.@  Wimbley called
his friend Ron Green (AGreen@), who arrived
shortly.  Everyone but appellant walked outside behind the pool hall, and Roy
listened as Wimbley and Green talked; Roy felt tense at what they were saying. 
The group then walked to where appellant stood with his cousin, Odrun Fontenot
(AFontenot@), in front of DT=s.  Appellant
asked Wimbley to Asquash this@ or, if Wimbley
had a problem, to Ago in the back and we can get it over
with.@  Appellant
testified Wimbley said he could not do that, and that Wimbley would Acatch me like he
want me.@  Appellant believed
this meant Wimbley would get his revenge.

It was common knowledge around the neighborhood that
appellant had Apunked@ Wimbley at DT=s.  When asked
whether Wimbley was upset about the rumors going around, Wimbley=s friend Green
testified, AWouldn=t you be?@

One or two weeks later, on October 4, 2003, appellant and
his cousin, Murphy Randall (ARandall@), went to a gun
show, where Randall purchased a knife.  Leundre Prescott invited appellant to
watch a Pay-Per-View boxing match between Evander Holyfield and James Toney
that night at his grandmother, Vivian O=Quinn=s, house.  Ms. O=Quinn was away
from home that evening.








Appellant arrived at Ms. O=Quinn=s house at 7:00
p.m.; he had a 40-caliber, semi-automatic pistol concealed in his waistband.[1] 
Although appellant testified he carried the gun because of Wimbley=s threats, he also
said he did not expect to see Wimbley that evening.  There is evidence Randall
brought the knife he purchased earlier that day.

During the boxing match, appellant and Green were the only
people rooting for James Toney to win, and were high-fiving each other.  When
the fight was over, most people went outside, into the garage and driveway in
front of the house.

Ms. O=Quinn=s home is
positioned at the end of a cul-de-sac.  The two-car garage has two large garage
doorsConly the right
side door was open that night.[2] 
A small concrete walkway leads up from the driveway to the front door of the
house, to the right of the garage.  There were four cars in the driveway on
October 4th, including Kedrick Riley=s work truck
(parked at the top of the drive on the right-hand side, in front of the opened
garage door).  Appellant=s Ford Expedition was parked to the right
of the driveway on the street, in front of Ms. O=Quinn=s mailbox.  Ron
Green parked his car on the street to the left of the driveway.  Leosha
Prescott and Marcus Cambric parked their cars on the street around the
cul-de-sac, one or two houses down from Ms. O=Quinn=s.  Wimbley
arrived late and parked Acaddy corner@ at the end of the
driveway, in front of and partially blocking appellant=s Expedition.

Ron Green, Leosha Prescott, Terrence Porter, and Kedrick
Riley testified for the State.  Green and Leosha Prescott admitted they had
been Wimbley=s friends.  Riley met Wimbley in 1998.  Appellant and
his brother, Roy, testified for the defense.[3]








Leosha Prescott testified Wimbley arrived late, when it was
already dark outside.  Leosha Prescott said Wimbley was Ahis regular self,@ and he talked
near his car for about twenty minutes.  When Wimbley noticed appellant, he was Ashocked.@  Wimbley appeared
to be happy and said, AWhoa, today must be my birthday.@  Appellant
testified he first noticed Wimbley when he heard the Abirthday@ comment, and he
felt frightened when he heard this because of Wimbley=s prior threats.[4]








Wimbley approached appellant at the Alip@ of the garage and
indicated he wanted to fight.[5] 
Appellant, also known as ATall Joe,@ stood about six
inches taller than Wimbley.  Green testified that the two men argued in a
confrontational but moderate way:  AIt=s not escalating
where they hollering at the top of their lungs or you got to hold anybody
back.  They being men about it.@   Appellant testified he told Wimbley he Adidn=t come here for
that,@ and he did not
want any trouble.  Appellant said Wimbley replied it was his lucky day, and AWe=re not leaving. 
You got your friends I got my friends.@  They stared at
each other Aeye to eye@ for two or three
seconds before Wimbley turned around and walked to his car.[6] 
Appellant said he saw Wimbley go to his car, put his gun on the passenger seat,
and let the window down.[7] 
Appellant testified he overheard Wimbley on his cell phone saying Abring the AK I got
a live one blocked in.@  Appellant said he asked, generally, to
everyone present Aplease not to let this happen,@ and asked if
someone could stop it, but that no one responded.  Green testified he did not
hear appellant say this.  The confrontation ended without incident, and
everyone returned to what they had been doing.  Wimbley and Green walked to the
driveway and talked.  Appellant went inside for about fifteen minutes.

Appellant testified that when he went inside, he told
Leundre Prescott[8]
that Wimbley had a gun and asked for help making Wimbley leave.  Appellant
asked not to let Athis@ happen here, at
Leundre=s grandmother=s house, and said
he did not want any trouble, but Leundre did not respond.  This made appellant
think he needed to leave.  After ten or fifteen minutes inside, appellant went
outside and Ait was just getting dark.@  Appellant stayed
in the garage for ten or twelve minutes and decided to walk down the driveway
toward his truck.

Green testified he stood in the center of the driveway
between Riley=s work truck and the car parked behind it, talking
with Wimbley, who stood in the very center of the driveway.  Riley testified
Wimbley had his foot up on the bumper of the car parked in front of the closed
garage door, on the left.  Green said Fontenot (appellant=s cousin) stood to
his right.  Green and Wimbley had talked for about thirty minutes when
appellant walked quickly down the middle of the driveway.  Green said it looked
as though appellant was trying to get to his Expedition and leave.  Green said
he was surprised appellant chose that route, because he was Acoming right up@ on Wimbley, and
he could have walked around that area.  Appellant testified he felt he could
have taken no other path to his truck because there were people on the left and
right sides of the driveway Ascattered all around,@ including two
friends of Wimbley=s, Green and Marcus Cambric.  Neither
Green nor Wimbley moved out of appellant=s way (when asked
whether he got out of appellant=s path, Green responded, AWhy should I?@).  What happened
next was described in different ways at trial.








Appellant=s Account

Appellant testified that, when he walked down the driveway
to his car, Wimbley stepped out and held his arms open wide, holding a knife in
his left hand.  Appellant walked past, and Wimbley punched appellant in the
back of the head.  Appellant stumbled forward and fell Aright by the
grass.@  When he turned
over, Wimbley was standing over him and took a swing at appellant.  Appellant
threw his hands up and Wimbley cut him on his right pinky finger.  Wimbley was Astill coming@ at him with a
knife, so he  threw his legs up and was cut on the leg.  Photographs and
medical records show these cuts, and appellant stated that, when he went to the
hospital two days later, it was too late to get stitches in his leg.[9] 
Appellant said he felt like his life was in danger.  He reached for his gun and
fired it once or twice toward Wimbley, who, once he noticed appellant had a
gun, started running between the cars.  Appellant believed Wimbley was running 
toward his car, where appellant had seen him put his gun earlier.  Appellant
got up from the ground and started toward his truck, but fell and scraped his
knee.  When he fell, appellant looked to his right and saw Wimbley.  Appellant
believed Wimbley had made it to his car to retrieve his gun.  Appellant fired
one or two more shots in Wimbley=s direction from
appellant=s position right in front of his Expedition. 
Appellant testified he never walked to where Wimbley fell; instead, he backed
up and ran to his truck.  Randall got in on the passenger side and he and
appellant drove away.

Green=s Account








Green testified that, when appellant walked down the
driveway, appellant stopped in front of Wimbley and said, AWhat, bitch?@  Wimbley hit
appellant and Randall jumped in, hitting Wimbley two or three times.  Green
testified appellant and Wimbley started Atussling@ and Green grabbed
Randall by the back of his shirt and held his head down between his legs to
keep him out of the fight.  Appellant ran to the right, behind Riley=s work truck,
knocking down Green and Randall.  By the time Green and Randall were on the
ground, Green mostly heard what was going on around him.  Appellant was Amotioning@ between the cars
and Green testified that, when appellant fell, Wimbley, sounding shocked,
hollered, AOh, ya=ll trying to jump me,@ and started
running in the opposite direction, across the driveway to the left of Ms. O=Quinn=s house.  Green
said he thought the two-person fist fight had turned into a brawl.  Green did
not know why appellant fell, but guessed Wimbley may have pushed him while
trying to get away.  According to Green, while Green and Randall were crouched
on the ground, appellant pulled out a gun and started firing from the grassy
area to the right of the driveway, toward Wimbley.  Green knew appellant pulled
a gun because he heard shots and felt gunpowder on his head.  Once appellant
started shooting, Green ran up the driveway and tried to enter the house=s front door, but
could not open the burglar bars, so he ran into the garage.  Green heard three
shots.  After appellant shot Aacross the cars,@ appellant started
motioning to the street.  Green stood in the garage and watched appellant Askip-walk@ to the street:  Aby that time that=s when I=m realizing
[Wimbley] must be on the ground and [appellant] fired two more shots in the
ground.@  Appellant then
walked backward to his Expedition, never taking his eyes off of the body. 
Randall jumped in the Expedition and they Aburnt off down the
street.@  Green walked to
the street and saw Wimbley lying face down, not moving or breathing.  Green
walked back up the driveway and told Leosha Prescott to call the police.[10] 
Green left in Wimbley=s car, explaining it was blocking his own
car.[11] 
Everyone but Riley, Leundre Prescott, and Leosha Prescott left.

Kedrick
Riley=s Account

Kedrick Riley left and returned a few times during the
evening.  He returned just before the fight between Wimbley and appellant, and
saw it from the end of the driveway.








Riley said appellant stumbled backwards into the grass when
Wimbley hit him.  Randall charged at Wimbley, and Green grabbed Randall.  That
is when Wimbley yelled, Aya=all fend to jump
me@ and Athe gun came out,@ causing Wimbley
to Arun for his life@ in between the
cars on the left side of the drive.  Riley saw Afire@ come out of the
gun as appellant shot.  Riley never saw Wimbley on the right side of the drive,
and never saw Wimbley come toward appellant.  He said Wimbley was eight feet away
when appellant pulled the gun out.  Once the Ashots rang out,@ Riley ran to the
grassy area in the middle of the cul-de-sac.  Riley saw Wimbley run to the left
between the cars, through the neighbor=s yard, and around
the neighbor=s mailboxCWimbley did not
run toward a car, he ran away from appellant.  Wimbley fell in the grass[12]
and did not move.  Riley testified he did not see appellant fall and hurt his
knee.

Appellant Atrotted@ down the driveway
after Wimbley, and Riley hid behind appellant=s Expedition and Apeeped@ around the back
of the truck.  Riley saw appellant Atrot@ or Askip, hop and jump@ over to Wimbley. 
Appellant stood close enough to kick him, said ALike I told you
bitch,@ and fired twice
more before driving away.  Riley went over to Wimbley, touched him, and said Ayou can wake up
now.@  Green told
Leosha Prescott to call the police.  Riley admitted that, at the time, he was
on probation for aggravated assault of a police officer and his probation was
revoked for a Adirty@ urinalysis after Wimbley=s death.  At the
time of trial, Riley resided in a substance abuse facility.

Terrence
Porter=s Account








Terrence Porter, who admitted to being a convicted felon,
was playing a Matrix Revolutions video game in the garage when he heard gun
shots.  When he looked back, he saw appellant standing in the middle of the
driveway, shooting, and Wimbley running toward the street while appellant
followed.  Porter said he ran into the house and threw up.[13]

Physical
Evidence

Wimbley was found lying face down in the street to the left
of Ms. O=Quinn=s home.  He had
been shot three times:  Once to the face, once to the lower back, and once in
his left arm.  No weapons were found on his body.

Police found three droplets of blood in front of Ms. O=Quinn=s home belonging
to Green.[14] 
Consistent with Green=s account of where he walked after the
shooting started, one droplet was in the walkway by Ms. O=Quinn=s front door, one
was in the center of the driveway close to the garage, and another was in the
middle of the driveway, close to the street.  Police did not find appellant=s blood, although
appellant testified he bled when Wimbley cut him.








Police found a knife in the grass to the right of the driveway,
close to the street.  There was no blood on the knife.  Appellant=s cell phone was
found in the grass in the middle of the yard in front of Ms. O=Quinn=s front door, to
the right of the drive.  Four bullet casings were recovered:  One in the lower
mid-section of the driveway near the street, one in the street by the driveway
(near where Wimbley=s car had been parked), one across the
cul-de-sac that may have been kicked or moved by cars driving by, and another
beside Wimbley=s body.  A fired bullet was recovered next to Wimbley=s body, and bullet
fragments were found in the street to the right of Wimbley=s feet.[15] 
Video and photographs taken at the scene showed the only working light was
across the street; it was very dark around Ms. O=Quinn=s home.

Two days after the shooting, on October 6, 2003, appellant
went to his attorney=s office and then to the emergency room. 
He received treatment for a contusion to his head, cuts to his right little
finger and right ankle, and abrasions on his right knee.

Procedural History

A jury convicted appellant of murder.  Appellant filed a
motion for new trial, which the trial court denied, and timely filed his notice
of appeal.  He argues the evidence is factually insufficient to support his
conviction because the State=s witnesses gave differing accounts of
events, Wimbley provoked the fight that led to his death, and because appellant
saw Wimbley with a gun, and therefore feared for his life.

Standard of Review and Applicable Law








In a factual sufficiency challenge, we view all the
evidence in a neutral light to determine whether the jury was rationally
justified in finding guilt beyond a reasonable doubt.  Zuniga v. State,
144 S.W.3d 477, 484 (Tex. Crim. App. 2004).  We will set aside a verdict only
if it is so contrary to the overwhelming weight of evidence as to be clearly
wrong and unjust.  Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim. App.
1996).  A clearly wrong and unjust verdict occurs when the jury=s finding shocks
the conscience or clearly demonstrates bias.  Zuniga, 144 S.W.3d at
481.  Evidence may be insufficient in two ways:  (1) Considered by itself,
evidence supporting the verdict may be too weak to find guilt beyond a
reasonable doubt, or (2) evidence contrary to the verdict may be strong enough
to preclude a finding of guilt beyond a reasonable doubt.  Id. at 484B85.

In a factual sufficiency analysis, we Aconsider only
those few matters bearing on credibility that can be fully determined from a
cold appellate record.@  Johnson v. State, 23 S.W.3d 1, 8
(Tex. Crim. App. 2000).  While such approach occasionally permits some
credibility assessment, unless the available record clearly reveals a different
result is appropriate, we must defer to the jury=s determination
about what weight should be placed upon contradictory testimony.  Id. 
This deference is necessary because the factfinder is able to examine Atell‑tale
signs of credibility@ like physical appearance, demeanor, and a
witness= cadence of speech
that are unavailable to this Court.  Id. at 8 n.9 (quoting Commonwealth
v. Williams, 554 Pa. 1, 720 A.2d 679, 684 (1998)).








A person commits murder if he intentionally or knowingly
causes the death of an individual, or if he intends to cause serious bodily
injury and commits an act clearly dangerous to human life that causes the death
of an individual.  Tex. Pen. Code Ann.
' 19.02 (Vernon
2003).  A person is entitled to use deadly force if (1) a reasonable person in
his situation would not have retreated, and (2) when and to the degree he
reasonably believes deadly force is immediately necessary to protect himself
against the other=s use or attempted use of unlawful deadly
force, or to prevent the other=s imminent commission of murder.[16] 
Tex. Pen. Code Ann. ' 9.32 (Vernon
2003).  A person has the right to defend himself from apparent danger to the
same extent he would if the danger were real.  Hamel v. State, 916
S.W.2d 491, 493 (Tex. Crim. App. 1996);  Jones v. State, 544 S.W.2d 139,
142 (Tex. Crim. App. 1976).  When a person=s acts cease to be
defensive and take on the offensive, he becomes the aggressor, and is no longer
acting in self‑defense.  Witty v. State, 150 Tex. Crim. 555, 203
S.W.2d 212, 218 (1947).

Once a defendant produces evidence of self-defense, the
State bears a burden of persuasion to refute this defense.  Saxton v. State,
804 S.W.2d 910, 914 (Tex. Crim. App. 1991).  This does not mean the State is
required to produce more evidence; the State only needs to prove its case
beyond a reasonable doubt.  Id.  A fact finder implicitly finds against
a defensive theory by finding the defendant guilty.  Zuliani v. State,
97 S.W.3d 589, 594 (Tex. Crim. App. 2003).  The same factual sufficiency
standard of review applies when evidence contrary to a defendant=s claim of
self-defense is challenged on appeal.  Zuniga, 144 S.W.3d at 484B85; Zuliani,
97 S.W.3d at 595; see Roy v. State, 161 S.W.3d 30, 36B37 (Tex. App.CHouston [14th
Dist.] 2004, no pet.) (harmonizing articulation of standards in Zuniga and
Zuliani).

Analysis

Appellant points to no specific inconsistencies in the
testimony from State witnesses, although we have noted some in the facts
above.  After fully reviewing the record, we find the consistencies are more
prevalent.  State witnesses testified appellant fired on Wimbley as Wimbley ran
away, and fired two more shots after following Wimbley into the street. 
Wimbley was, in fact, shot twice from behind.








Further, whether or not Wimbley provoked the fight is not
definitive in determining whether appellant was justified in using deadly force
by shooting at Wimbley as he ran away, and again as Wimbley lay in the street. 
Appellant was the only witness who testified that Wimbley had a gun that night,
and appellant was inconsistent in his testimony, stating first that he saw
Wimbley put the gun in his car, and then on cross-examination that he did not
know whether Wimbley put the gun in the car.  Other witnesses testified Wimbley
did not have a gun.  Appellant=s testimony that he was defending himself
from Wimbley=s knife attack is also contradicted, and is lessened
by the fact that his blood was not found at the scene, despite his testimony
that his cuts were bleeding.

The jury, as the finder of fact, was free to disbelieve
appellant=s testimony.  Nothing in the record clearly reveals a
different result is appropriate, and we must defer to the jury=s determination
about what weight should be placed upon each witness= testimony. 
Viewing all evidence in a neutral light, we find the jury was rationally
justified in finding guilt beyond a reasonable doubt.

We overrule appellant=s sole point of
error, and affirm the trial court=s judgment.

 

 

 

 

_____________________________

Margaret Garner Mirabal

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed August 15, 2006.

Panel consists of
Justices Fowler, Seymore, and Senior Justice Margaret Garner Mirabal (sitting
by assignment).

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  At least fourteen people were at Ms. O=Quinn=s home that
night:  Novie O=Quinn (Ms. O=Quinn=s son), Ron Green, Leosha Prescott, and Marcus Cambric
(friends of Wimbley=s), Leundre Prescott, Odrun Fontenot, and Murphy
Randall (friends of appellant=s), Kevin
Wilson (who was described as Aneutral@), two childrenCMarcus
Cambric=s son Alittle Marcus@ and younger brother, T.J.CKedrick Riley, and Terrence Porter.  The Prescott
brothers, Terrence Porter, and Kedrick Riley are Ms. O=Quinn=s grandsons.





[2]  We refer to the right or left sides as they appear
when facing the house from the street.





[3]  Roy witnessed the events at DT=s pool hall; he was not present at Ms. O=Quinn=s on October
4th.





[4]  Appellant testified that, after the Abirthday@
comment, he saw Wimbley walk back and forth to his car and heard Wimbley Ablurting out different things that we=re not going to leave, that he should have been did
this, took care of me and stopped me from coming around there.@  Appellant said he saw Wimbley put a gun in his
waistband before he walked up to appellant, and that Wimbley was looking at
appellant=s waist area when he first approached appellant,
apparently checking for a gun.





[5]  Green and Leosha Prescott both testified Wimbley
emptied his pockets, took off his jewelry, and lifted his shirt to indicate he
wanted to fight and was unarmed before first approaching appellant.  Green
could not remember whether he ever told the police that Wimbley lifted his
shirt, and Leosha Prescott stated he never told the police or prosecutors
Wimbley picked up his shirt, even though he admitted this fact would be important
to know.





[6]  On cross-examination, appellant explained he did not
lift his shirt to show Wimbley his gun because that would have meant he wanted
trouble.





[7]   On cross-examination, appellant testified he last
saw the gun in Wimbley=s waistband, and that he did not know for sure whether
Wimbley put the gun in his car.  Green testified appellant was the only person
that day with a gun.





[8]  Leundre Prescott, appellant=s friend, was deceased at the time of this trial.  His
brother, Leosha Prescott, wore a shirt bearing Leundre Prescott=s picture when he testified.





[9]  Despite appellant=s
testimony that his stab wounds were bleeding, his blood was not found on the
scene.





[10]  Leosha Prescott testified Green made no such
statement, and that he called for an ambulance on his own.  Riley testified
Green told Leosha Prescott to call Athe
laws.@  It is uncontradicted that no one cooperated with the
police investigation that night.





[11]  Appellant argues Green left in Wimbley=s car to prevent law enforcement from locating Wimbley=s weapon, and that the other State=s witnesses (who were friends of Wimbley) did not
admit  to seeing Wimbley with a gun because there is Ano doubt that they all wanted to help [Wimbley].@





[12]  On cross examination, Riley testified Wimbley fell
in the middle of the street.





[13]  Porter=s
testimony contained several inconsistencies.  Although Porter testified he only
knew Aof@ appellant and
Wimbley, he also stated he knew Wimbley well.  Although he testified there were
Acars@ in the
driveway, he also said there was maybe only one car in the drive.  He did not
know whether there was a motorcycle at the house that day.  Porter=s testimony changed between Ahearing@
the first shots as he played his video game to Aseeing@ all five shots.  Porter did not tell the police he
saw who shot Wimbley until one week before trial, and admitted that he lied to
the police at least four times.  On cross-examination, defense counsel stated
he noticed Porter looking at people seated in the front row in the courtroom. 
When asked if he knew anyone there, Porter said that he did not.  When asked
whether these people were Wimbley=s
family and friends, he answered they are, and admitted that he lied when he
said he did not know them.





[14]  Green was stabbed in the hand that evening; his hand
bled heavily.  Green believed Randall had a knife and that he was cut when he
and Randall fell down in the driveway.





[15]  The shot to Wimbley=s right cheek took a front-to-back, slightly downward path and lodged
in his spine.  A medical expert testified this shot would have paralyzed
Wimbley immediately, and likely ended his life.  AImpact abrasions@ on Wimbley=s
face were consistent with that of an unbroken fall landing directly on the
face; Wimbley had no abrasions on his palms.  One bullet to Wimbley=s left lower back traveled left-to-right and slightly
upward and lodged in his spine; the wound was oval, indicating the bullet
entered the body at an angle.  This shot would not have immediately immobilized
Wimbley.  One shot traveled through Wimbley=s
left arm above the elbow on a back-to-front, horizontal path.  There was no
stippling (abrasions caused by particles of unburned gun powder striking the
skin around the bullet entrance wound) around any of the gunshot wounds,
indicating the gun=s barrel was more than two feet from the body when
fired.  An autopsy showed Wimbley had marijuana in his system when he died.





[16]  The statutory exceptions to a person=s ability to use force in defense of himself do not
apply in this case.  Tex. Pen. Code Ann.
'' 9.31(b), 9.32(a)(1).