J-S46007-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ATIBA WICKER | |
| Appellant | No. 819 EDA 2014 |

Appeal from the Judgment of Sentence December 18, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002845-2012
CP-51-CR-0002843-2012
CP-51-CR-0002844-2012

BEFORE:  MUNDY, J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.:                    **FILED AUGUST 13, 2015**

Appellant, Atiba Wicker, appeals from the December 18, 2013 aggregate judgment of sentence of 31 to 72 years' imprisonment, imposed after he was found guilty of three counts of aggravated assault, and one count each of possession of a firearm prohibited and recklessly endangering another person (REAP).[1]  After careful review, we affirm.

The trial court summarized the relevant factual and procedural history of this case as follows.

> Philadelphia Police Officer Tamike Reid testified that, at approximately 7:45 p.m. on October 2, 2011, she was driving to work at the 18th Police District in her personal vehicle when she observed

_____

[1] 18 Pa.C.S.A. §§ 2702(a), 6105(a) and 2705, respectively.

four males standing outside La Pearl Bar, located at 54th Street and Haverford Avenue in the City of Philadelphia. As she approached, she observed a taller male, she described as appearing to be the "bouncer or security" strike another shorter male. She pulled to the corner and observed the shorter male get into a black Mercedes and drive away. She explained she didn't take further action because she was not in full uniform and had no radio to call for backup.

Later, while on duty, she heard a citywide high priority radio call announcing, "Cars stand by, 19th District, 54th and Haverford, report of a shooting at La Pearl Lounge." She immediately drove to La Pearl, approximately 10 to 12 blocks away, and reported her earlier observations to the assigned detective and later in the evening gave him a detailed statement of her observations.

Philadelphia Police Detective Robert Daly testified that on October 2, 2011, he was assigned to the Southwest Detectives Division of the Philadelphia Police Department located at 55th and Pine Streets in the City of Philadelphia, when at approximately 8:30 p.m. he was assigned as the lead investigator to investigate the shooting at La Pearl. On arriving there at approximately 9:00 p.m. he immediately noticed fired cartridge casings on the ground and bullet holes in the front door. Detective Daly, testified that he interviewed and took photographs of Mr. Alvin Chandler who had been injured by flying glass. He testified that Mr. Chandler told him he was at the door at the time of the shooting but was unable to give him a description of the shooter.

After completing his initial investigation at La Pearl, Detective Daly proceeded to the Hospital of the University of Pennsylvania to interview the other two victims of the shooting, Ms. Keisha Beckles and Mr. James Rice. He described Ms. Beckles injuries as consisting of a large gash across her upper lip and out the side from where she got shot in the face. After interviewing Ms. Beckles, he next interviewed

Mr. Rice in his room. He described Mr. Rice's room as having an open door and filled with his friends. He took a brief statement from Mr. Rice in which he told Detective Daly that he had seen the shooter but gave no description.

Detective Daly returned to the Hospital the next day with a photo array he had compiled from information gathered as a result of his investigation. This array did not contain a photograph of [Appellant]. Although Mr. Rice was unable to identify anyone from the array, he again told Detective Daly that, "Yeah, I'll be able to I.D. him."

As the investigation continued, Detective Daly maintained contact with Mr. Rice, who refused to come into the offices of Southwest Detectives, because "he was very apprehensive about coming in." On October 25, 2011 Detective Daly eventually got Mr. Rice to meet with him at Central Detective Division because it has an underground entrance that can't be seen from the street. At this meeting, using the description of the shooter given to him by Mr. Rice, Detective Daly created a large computer generated photo array. Mr. Rice identified the photograph of one individual, not [Appellant], as looking like the shooter but clear that this person was not the shooter.

Detective Daly, testified that on November 6, 2011, he received a phone call from Mr. Rice saying, "the boy that shot me just called me" from a blocked caller I.D. number. On November 10, 2011, after spending several days tracing the call back through Mr. Rice's phone carrier, Detective Daly recovered the blocked number and called it, reaching Ms. Jacquetta Rouse. She told him that on November 6 she had been on a date with [Appellant], whom she just knew as "T," but was unaware of any phone call made to Mr. Rice. She also gave Detective Daly [Appellant]'s phone number. Based on the information he received from Ms. Rouse, Detective Daly, was able to identify [Appellant] and prepared a photo array containing [Appellant]'s photo. On

- 3 -

November 11, 2011, he displayed the array to Mr. Rice, who immediately identified [Appellant] as the shooter.

Mr. James Rice testified that on, Sunday, October 2, 2011, he was employed at La Pearl Bar located at 54th Street and Haverford Avenue in the City of Philadelphia. On that particular evening he was providing security at the front door.

He testified that between approximately 7:30 to 7:45 p.m. [Appellant] threw a drink on one of the dancers in the establishment. On seeing this, he walked over to [Appellant] saying to him, "Come on outside. Let me talk to you for a minute." After going outside [Appellant] appeared to be receptive to Mr. Rice's concerns when another patron, Julius Faison, whom he knows as "Drew", came outside. Faison engaged [Appellant] in an argument over the drink having spilled on him as well. The verbal argument soon led to an exchange of blows between the two of them. [Appellant] then went to his car and drove off.

Mr. Rice testified that approximately thirty to forty minutes later [Appellant] returned with a gun and asked Mr. Rice, "Where did that guy go?" Being preoccupied, he responded, "He's not here. Give me a second." When others noticed the gun, Mr. Rice got everyone inside the bar and closed the door behind him. Seconds after closing the door, Mr. Rice heard gunshots and was struck in the back by a bullet. He also testified that two other people were injured as a result of the shooting.

Mr. Rice was then driven to the hospital in a police car for treatment. After receiving treatment, Mr. Rice testified he gave a statement to the investigating detective.

When asked on direct examination why the statement he made to Detective Daly in the hospital differed from his testimony at trial he responded, because "there was probably people inside the

- 4 -

hospital with me, and I'm not going to be talking to the police." When asked why he would not meet with Detective Daly in his offices at 55th and Pine Streets, Mr. Rice replied, "It's my neighborhood. I wasn't going. I would have never went there." He also testified that he had pointedly refused Detective Daly's request to meet him in his office.

Mr. Rice testified that on November 6, 2011, he received a phone call at approximately 2:30 p.m. from a blocked phone number. The first voice he heard was a female voice followed by a male voice who identified himself "T" or "D," "The person that shot you" who then said, "Don't worry about it I'll cut you a check."

Mr. Rice immediately called Detective Daly to report this call. Subsequently, on November 11, 2011, he met with Detective Daly who showed him a photo array from which he identified [Appellant]'s picture.

Ms. Jacquetta Rouse testified that shortly after being on a date with [Appellant] she received a phone call from detectives inquiring about [Appellant] and his use of her cell phone. She told them that at the time she only knew [Appellant] as "T" and gave them his phone number. She further testified that she was not aware that [Appellant] had used her phone nor did she know Mr. Rice. She also testified that [Appellant] later admitted to her that he had used her phone because he had something he wanted to straighten out.

Ms. Nicole Cooper testified that [Appellant] has been her boyfriend since 2009. She also testified that on the evening of October 2, 2011, she encountered [Appellant] at La Pearl and got into a heated argument, each upset that the other was there. After the argument [Appellant] walked away and she didn't see him until later that night. When asked about the shooting she testified, "something did happen while I was there because I ran out." "I didn't see anyone get shot."

FBI Special Agent William Shute, a seventeen year veteran of the FBI, currently assigned to the FBI's Cellular Analysis Survey Team, was qualified, without objection, as an expert in the field of historical cell site analysis. Analyzing [Appellant]'s cell phone usage records, Agent Shute testified that, on October 2, 2011: 1) at 6:41 p.m., [Appellant]'s cell phone was located in the vicinity of 11th and Spring Garden Streets in the City of Philadelphia, east of La Pearl; 2) at 7:07 p.m., usage of the phone began to move; 3) at 7:29 p.m., in the immediate vicinity of La Pearl; 4) at 7:46 p.m. the phone is on the move away from La Pearl heading in the westerly direction; 5) at 8:20 p.m, in the vicinity of Cobbs Creek Parkway and Walnut Street, west of La Pearl; 6) at 8:27 p.m., in the vicinity of 63rd Street and Lebanon Avenue, west and north of La Pearl; and 7) at 8:40 p.m., in the vicinity of Fairmount Park, east of La Pearl. Agent Shute also testified that there were no calls logged on [Appellant]'s phone between 8:27 to 8:40 …. He further testified that the route between the cell sites of these two calls, would have taken [Appellant] through three cell towers, one of which is located in the vicinity of La Pearl. The usage records indicate that [Appellant] travelled directly back to his starting point at 11th and Girard from the location of the 8:40 call.

Trial Court Opinion, 9/16/14, at 5-11 (some internal quotation marks and citations omitted).

On November 15, 2011, the Commonwealth filed three informations, charging Appellant with one count each of aggravated assault and possession of a firearms prohibited at CP-51-CR-2843-2012; one count each of aggravated assault and REAP at docket number CP-51-CR-2844-2012; and one count of aggravated assault at docket number CP-51-CR-2845-2012. Appellant proceeded to a jury trial on February 20, 2013, but the trial

court declared a mistrial on February 25, 2013. Appellant proceeded to a second jury trial on May 22, 2013. On June 3, 2013, at the conclusion of the second trial, the jury found Appellant guilty of all charges. On December 18, 2013, the trial court imposed an aggregate sentence of 31 to 72 years' imprisonment. Appellant filed a timely post-sentence motion on December 26, 2013, which the trial court denied on March 7, 2014. On March 18, 2014, Appellant filed a timely notice of appeal.[2]

On appeal, Appellant raises four issues for our review.

> I. Did the trial court err in allowing the testimony of Agent Kelly Ashton as to Appellant's statements made to her while he was in custody and after his indictment?
>
> II. Did the [trial] court err in not allowing Juror #8 to submit his question to the [trial] court in writing so it could either be asked or rephrased, or denied?
>
> III. Should this matter be remanded for a hearing on whether there was probable cause to execute a search warrant for Appellant's cell usage records?
>
> IV. Did the [trial] court err when it failed to give a [**Commonwealth v. Kloiber**, 106 A.2d 820 (Pa. 1954)] charge to the jury on identification and omitted any discussion of identification[?]

Appellant's Brief at 17.

---

[2] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellant's first issue pertains to the denial of his motion to suppress. We begin by noting our well-settled standard of review.

> [I]n addressing a challenge to a trial court's denial of a suppression motion [we are] limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Washington*, 63 A.3d 797, 802 (Pa. Super. 2013) (some brackets and citation omitted).

Here, Appellant argues that his statements concerning his being in a bar and that the police were looking for him, made to Agent Kelly Ashton of the Pennsylvania Board of Probation and Parole, after the conclusion of a parole hearing, violated his Sixth Amendment rights under the Counsel Clause pursuant to the Supreme Court's decision in *Massiah v. United States*, 377 U.S. 201 (1964). Appellant's Brief at 21. In *Massiah*, the defendant had already been indicted on several drug offenses and was free on bail pending trial. *Id.* at 201. Unbeknownst to Massiah, his co-defendant had decided to cooperate with the federal authorities and the government installed a radio transmitter, similar to what is colloquially known as a "wire" today, in the co-defendant's car. *Id.* at 202-203. Massiah unknowingly

made several incriminating statements to his co-defendant which the federal agents listened to via the radio transmitter. *Id.* at 203.

The Supreme Court held that the admission of these inculpatory statements violated Massiah's Sixth Amendment rights under the Counsel Clause.

> We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. It is true that in the Spano case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, "if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon […] because he did not even know that he was under interrogation by a government agent."

*Id.* at 206.

In the case *sub judice*, Appellant argues that **Massiah** requires the suppression of Appellant's statements to Agent Ashton. However, here, Agent Ashton testified that Appellant himself **initiated** the conversation by waving her over to him. N.T., 1/11/13, at 11-12.[3] Although Appellant's

---

[3] We note the cover page on the transcript erroneously lists the date of the testimony as January 11, 2012.

Sixth Amendment right to counsel had attached, **Massiah** only applies to statements elicited by the Commonwealth or its agents through some affirmative action. **Massiah**, **supra**. Our Supreme Court has recognized this distinction. **See Commonwealth v. Mayhue**, 639 A.2d 421, 436 (Pa. 1994) (finding there was no violation of Massiah where Mayhue initated conversations with a jailhouse informant). Based on these considerations, we conclude the trial court properly denied Appellant's motion to suppress on this basis. **See Washington**, **supra**.

In Appellant's second issue, he avers that the trial court "erred in not allowing juror number 8 to submit his question to the [trial] court so that it could be asked[.]" Appellant's Brief at 24. However, before we may review this issue, we must determine whether it has been properly preserved for our review, as the trial court concludes Appellant waived this issue by not objecting during the trial.

It is axiomatic that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Our Supreme Court has repeatedly emphasized the importance of issue preservation.

> Issue preservation is foundational to proper appellate review. Our rules of appellate procedure mandate that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). By requiring that an issue be considered waived if raised for the first time on appeal, our courts ensure that the trial court that initially hears a dispute has had an opportunity to

- 10 -

consider the issue. This jurisprudential mandate is also grounded upon the principle that a trial court, like an administrative agency, must be given the opportunity to correct its errors as early as possible. Related thereto, we have explained in detail the importance of this preservation requirement as it advances the orderly and efficient use of our judicial resources. Finally, concepts of fairness and expense to the parties are implicated as well.

*In re F.C. III*, 2 A.3d 1201, 1211-1212 (Pa. 2010) (some internal citations omitted); *accord Commonwealth v. Miller*, 80 A.3d 806, 811 (Pa. Super. 2013) (citation omitted).

Instantly, the following exchange occurred at the end of redirect examination of a defense witness.

> Juror No. 8:       I have a question.
>
> The Court: We don't do questions. But the court officer will speak to you.
>
>       Do you have any recross?
>
> [Commonwealth]:       No.
>
> [Defense Counsel]:       I apologize there was one other thing.
>
> The Court: Okay.
>
>                              …
>
> The Court: In some jurisdictions, not in Pennsylvania, in some jurisdictions jurors can ask questions.

N.T., 5/30/13, at 81-82. We have reviewed the transcript and are unable to locate any place in the record where Appellant made a contemporaneous

objection to the trial court's answer to the juror's request. As a result, we deem this claim waived on appeal.[4]

We elect to address Appellant's final two issues together. In his third issue, Appellant asks that this Court remand this case for a new suppression hearing as to whether a search warrant obtained for Appellant's cell phone records was supported by probable cause. Appellant's Brief at 36. In his fourth issue, Appellant avers the trial court erred in not giving a **Kloiber** instruction to the jury. *Id.* at 38, 44.

By its plain text, Rule 1925(b) requires that statements "identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge." Pa.R.A.P. 1925(b)(4)(ii). The Rule also requires that "[e]ach error identified in the Statement will be deemed to include every subsidiary issue contained therein which was raised in the trial court …." *Id.* at 1925(b)(4)(v). Finally, any issues not raised in accordance with Rule 1925(b)(4) will be deemed waived. *Id.* at 1925(b)(4)(vii). Our Supreme Court has held that Rule 1925(b) is a bright-line rule.

> Our jurisprudence is clear and well-settled, and firmly establishes that: Rule 1925(b) sets out a simple bright-line rule, which obligates an appellant to file and serve a Rule 1925(b) statement, when so

---

[4] As this issue is waived, we express no opinion on the larger question of whether, and under what circumstances, juror questioning should be permissible in Pennsylvania.

ordered; any issues not raised in a Rule 1925(b) statement will be deemed waived; the courts lack the authority to countenance deviations from the Rule's terms; the Rule's provisions are not subject to *ad hoc* exceptions or selective enforcement; appellants and their counsel are responsible for complying with the Rule's requirements; Rule 1925 violations may be raised by the appellate court *sua sponte,* and the Rule applies notwithstanding an appellee's request not to enforce it; and, if Rule 1925 is not clear as to what is required of an appellant, on-the-record actions taken by the appellant aimed at compliance may satisfy the Rule. We yet again repeat the principle first stated in [**Commonwealth v.**] **Lord**, [719 A.2d 306 (Pa. 1998)] that must be applied here: "[I]n order to preserve their claims for appellate review, [a]ppellants must comply whenever the trial court orders them to file a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925. Any issues not raised in a Pa.R.A.P. 1925(b) statement will be deemed waived." [**Id.**] at 309.

**Commonwealth v. Hill**, 16 A.3d 484, 494 (Pa. 2011) (footnote omitted).

In this case, Appellant's Rule 1925(b) statement fails to list any claim addressing a **Kloiber** instruction, or any suppression issue apart from the statements made to Agent Ashton. **See** Appellant's Rule 1925(b) Statement, 4/14/14, at 1-2. As a result, Appellant may not raise these issues for the first time on appeal. Therefore, we deem these two claims waived.[5]

---

[5] For the same reason, Appellant's separate application for remand to litigate a suppression motion on the basis of **Riley v. California**, 134 S. Ct. 2473 (2014), is denied.

Based on the foregoing, we conclude all of Appellant's issues on appeal are either waived or devoid of merit.[6] Accordingly, the trial court's December 18, 2013 judgment of sentence is affirmed.

Judgment of sentence affirmed. Application for remand denied. Application for extension of time to file brief denied.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/13/2015

---

[6] The Commonwealth's application for an extension of time to file its brief is denied.